**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

                *Plaintiff,*

             v.

**CKB168 HOLDINGS LTD., ET AL.**

                *Defendants,*

   - AND -

**ROSANNA LS INC., ET AL.**

            *Relief Defendants.*

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUL 1 0 2015 ★

BROOKLYN OFFICE

**CASE NO.13-cv-5584 (RRM)**
**(RLM)**

---

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S NOTICE OF FILING OF DEFENDANT CHIH HSUAN "KIKI" LIN AND RELIEF DEFENDANT USA TRADE GROUP, INC. CONSENT AND JUDGMENT

**PLEASE TAKE NOTICE** that Plaintiff Securities and Exchange Commission ("SEC") is filing contemporaneously with this notice the executed Consent and Proposed Judgment for defendant Chih Hsuan "Kiki" Lin and relief defendant USA Trade Group, Inc. Entry of the Proposed Judgment will resolve defendant the liability of defendant Kiki Lin, with Kiki Lin's and USA Trade Group, Inc.'s disgorgement, prejudgment interest and civil penalty to be determined by the Court at a later date, upon motion of the SEC. The SEC respectfully requests the Court to enter the Proposed Judgment as to defendant Chih Hsuan "Kiki" Lin and relief defendant USA Trade Group, Inc.

Dated: February 12, 2015

/s/ Daniel J. Maher
Daniel J. Maher
Assistant Chief Litigation Counsel
U.S. S.E.C.
100 F Street, NE
Washington, DC 20549
Tel: (202) 551-4737
Email: maherd@sec.gov
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on February 12, 2015, a true and correct copy of the *foregoing* was filed with the Clerk of the Court via ECF in accordance with the Federal Rules of Civil Procedure:.

Peiwen Chang
Cogswell Nakazawa & Chang, LLP
444 W. Ocean Blvd., Ste. 1410
Long Beach, CA 90802
Peiwen_Chang@cnc-law.com
Attorney for:
> *Toni Tong Chen*
> *Cheongwha ("Heywood") Chang*
> > Defendants

and

> *HTC Consulting Inc.*
> *Arcadia Business Consulting, Inc.*
> > Relief Defendants


Michael Joseph Frevola
Francis Robert Denig
Holland & Knight
31 West 52nd Street
New York, NY 10019
michael.frevola@hklaw.com
robert.denig@hklaw.com
Attorneys for:
> *Heidi Mao Liu (AKA "Heidi Mao")*
> > Defendant

Suzan Jo
Marvin Pickholz
Duane Morris LLP

1540 Broadway
New York, NY 10036-4086
sjo@duanemorris.com
Attorneys for:
    *CKB168 Holdings Limited*
    *CKB168 Limited*
    *WIN168 Biz Solutions Limited*
    *CKB168 Biz Solution, Inc.*
    *Cyber Kids Best Education Limited*
    *Hung Wai ("Howard") Shern*
    *Rui Ling ("Florence") Leung*
               Defendants

John Golaszewski
Schiller Law Group, PC
130 W. 42nd Street
Suite 10002
New York, NY 10036
jg@asfirm.com
Attorney for:
    *Daliang (David) Guo*
    *Wen Chen Hwang (Aka "Wendy Lee")*
    *Yao Lin*
    *Joan Congyi Ma (AKA "JC Ma")*
    *Chih Hsuan ("Kiki") Lin*
               Defendants
    *Rosanna LS Inc.*
    *Ouni International Trading Inc.*
    *EZ Stock Club Corp.*
    *E Stock Club Corp.*
    *USA Trade Group Inc*
               Relief Defendants

Jacob Frenkel
Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
jfrenkel@shulmanrogeres.com
Attorney for:
    *Rayla Melchor Santos (aka "Teacher Sam")*

                                           /s/     Daniel Maher
                                           Daniel Maher

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **13-cv-5584 (RRM)(RLM)** |
| | : | |
| CKB168 HOLDINGS LTD., ET AL. | : | |
| | : | |
| *Defendants,* | : | |
| | : | |
| - AND - | : | |
| | : | |
| ROSANNA LS INC., ET AL. | : | |
| | : | |
| *Relief Defendants.* | : | |
| | : | |

**CONSENT OF DEFENDANT CHIH HSUAN "KIKI" LIN AND
RELIEF DEFENDANT USA TRADE GROUP INC.**

1.      Defendant Chih Hsuan "Kiki" Lin ("Defendant") and Relief Defendant USA Trade Group, Inc. ("Relief Defendant") acknowledge having been served with the complaint in this action, enter a general appearance, and admit the Court's jurisdiction over Defendant and Relief Defendant, and over the subject matter of this action.

2.      Defendant hereby admits the facts contained in Annex A, Admissions of Defendant Chih Hsuan "Kiki" Lin, attached hereto and Defendant and Relief Defendant admit the allegations in the Complaint as to personal and subject matter jurisdiction and consent to the entry of the Judgment in the form attached hereto (the "Consent Judgment") and incorporated by reference herein, which, among other things:

(a) permanently restrains and enjoins Defendant from violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the

· 1 ·

Securities and Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5]; Section 5 of the Securities Act [15 U.S.C. § 77e]; and

Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and,

     (b) permanently restrains and enjoins Defendant from directly or indirectly,

including, but not limited to, through any entity owned or controlled by Defendant, offering,

operating, or participating in any marketing or sales program involving a security, including but

not limited to a program in which a participant is compensated or promised compensation solely

or primarily (1) for inducing another person to become a participant in the program, or (2) if such

induced person induces another to become a participant in the program.

    3.    Defendant and Relief Defendant agree that the Court shall order disgorgement of

ill-gotten gains, and prejudgment interest thereon, and Defendant agrees that the Court shall

impose a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendant and Relief Defendant

further agree that the amounts of the disgorgement and civil penalty shall be determined by the

Court upon motion of the Commission, and that prejudgment interest shall be calculated from

October 9, 2013, based on the rate of interest used by the Internal Revenue Service for the

underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Defendant and Relief

Defendant further agree that in connection with the Commission's motion for disgorgement

and/or civil penalties, and at any hearing held on such a motion: (a) Defendant and Relief

Defendant will be precluded from arguing that Defendant did not violate the federal securities

laws as alleged in the Complaint; (b) Defendant and Relief Defendant may not challenge the

validity of this Consent or the Consent Judgment; (c) the allegations of the Complaint shall be

accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in

the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

4.      Defendant and Relief Defendant acknowledge that any civil penalty paid pursuant to a Final Judgment in this case may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant and Relief Defendant agree that they shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's and Relief Defendant's payment of disgorgement in this action, argue that they are entitled to, nor shall they further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that she shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

3

5.      Defendant agrees that she shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to a Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.  Defendant further agrees that she shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to a Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

6.      Defendant and Relief Defendant waive the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

7.      Defendant and Relief Defendant waive the right, if any, to a jury trial and to appeal from the entry of the Consent Judgment.

8.      Defendant and Relief Defendant enter into this Consent voluntarily and represent that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant or Relief Defendant to enter into this Consent.

9.      Defendant and Relief Defendant agree that this Consent shall be incorporated into the Consent Judgment with the same force and effect as if fully set forth therein.

10.     Defendant and Relief Defendant will not oppose the enforcement of the Consent Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waive any objection based thereon.

4

11.     Defendant and Relief Defendant waive service of the Consent Judgment and agree that entry of the Consent Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant and Relief Defendant of its terms and conditions.

12.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant and Relief Defendant in this civil proceeding.  Defendant and Relief Defendant acknowledge that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability.  Defendant and Relief Defendant waive any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant and Relief Defendant further acknowledge that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization.  This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding.  In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant and Relief Defendant understand that they shall not be permitted to contest the factual allegations of the complaint in this action.

13.     Defendant and Relief Defendant understand and agree to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while

denying the allegations in the complaint or order for proceedings." As part of Defendant's and

Relief Defendant's agreement to comply with the terms of Section 202.5(e), Defendant and

Relief Defendant:  (i) will not take any action or make or permit to be made any public statement

denying, directly or indirectly, any allegation in the Complaint or creating the impression that the

Complaint is without factual basis; (ii) will not make or permit to be made any public statement

to the effect that Defendant does not admit the allegations of the Complaint, or that this Consent

contains no admission of the allegations; and (iii) upon the filing of this Consent, Defendant and

Relief Defendant hereby withdraw any papers previously filed in this action to the extent that

they deny, directly or indirectly, any allegation in the Complaint.  If Defendant or Relief

Defendant breaches this agreement, the Commission may petition the Court to vacate the Final

Consent Judgment and restore this proceeding to its active docket.  Nothing in this provision

affects Defendant's and Relief Defendant's:  (i) testimonial obligations; or (ii) right to take legal

or factual positions in litigation or other legal proceedings in which the Commission is not a

party.

      14.     Defendant and Relief Defendant hereby waive any rights under the Equal Access

to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other

provision of law to seek from the United States, or any agency, or any official of the United

States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's

fees or other fees, expenses, or costs expended by Defendant or Relief Defendant to defend

against this action.  For these purposes, Defendant and Relief Defendant agree that Defendant

and Relief Defendant are not the prevailing parties in this action since the parties have reached a

good faith settlement.

15.    Defendant and Relief Defendant agree that the Commission may present the Consent Judgment to the Court for signature and entry without further notice.

16.    Defendant and Relief Defendant agree that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Consent Judgment.

Dated: _1/8/2015_          _____
                           Chih Hsuan "Kiki" Lin

On _Jan. 8_, 2015, _Chih Hsuan Lin_, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

Notary Public
Commission expires: _10/31/2017_

USA Trade Group Inc.

By: _____
Chih Hsuan "Kiki" Lin
Title: _CEO_
Address: _3993 Spring Mtn Rd #30_
_Las Vegas NV 89102_

On _Jan. 8_, 2015, _Chih Hsuan Lin_, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent with full authority to do so on behalf of _USA Trade Group Inc_ as its _CEO_.

Notary Public
Commission expires: _10/31/2017_

7

Approved as to form:

John V. Golaszewski, Esq.
Schiller Law Group, PC
130 W. 42nd Street
Suite 1002
New York, New York 10036
Tel: (212) 768-8700, ext 102
Fax: (646) 205-3585
Attorney for Defendant and Relief Defendant

8

## ANNEX A
## Admissions of Defendant Chih Hsuan "Kiki" Lin

Defendant Chih Hsuan (Kiki) Lin ("Kiki Lin") admits to the facts set forth below and acknowledges that her conduct violated the federal securities laws:

### Background of Defendant Kiki Lin

1.  Kiki Lin was born in 1965 in Taiwan and emigrated to the United States in approximately 1999.  Kiki Lin resides in Las Vegas, Nevada and, from 2011 to the present, has done business in both Las Vegas and Los Angeles, California.

2.  USA Trade Group Inc. ("USA Trade") is a Nevada Corporation for which Kiki Lin serves as the sole officer and director.  Kiki Lin has signatory authority over bank accounts held in the name of USA Trade.

3.  Kiki Lin has never been registered with the Securities and Exchange Commission (the "SEC") as a broker or dealer or been associated with a broker or dealer registered with the SEC.

### The Scheme

4.  In or around July 2011 Kiki Lin was introduced to a group of companies, including, but not limited to, Defendants CKB168 Holdings Ltd., WIN168 Biz Solutions Ltd., CKB168 Ltd., CKB168 Biz Solution, Inc., and Cyber Kids Best Education Ltd. (collectively, hereinafter, "CKB").  Thereafter, Kiki Lin learned that Defendants Howard Shern ("Defendant Shern"), Florence Leung ("Defendant Leung"), and Rayla Melchor Santos ("Defendant Santos") referred to CKB using the names CKB, CKB168, CKBMax, and Cyber Kids Best.

5.  Kiki Lin became familiar with the structure and marketing of CKB within the United States based on her involvement with CKB and her interactions with Defendants Shern,

1

Santos, David Guo ("Defendant Guo"), Yao Lin ("Defendant Yao Lin"), Wendy Lee ("Defendant Lee"), and other CKB promoters.

6.      Through her involvement in CKB, Kiki Lin learned that Defendant Shern was responsible for creating the marketing materials and implementing the marketing plan of CKB and that Defendant Leung was responsible for CKB finances.

7.      According to marketing material and presentations provided to and used by Kiki Lin, CKB was a successful multi-level marketing company based in Hong Kong that earned revenue by selling online educational courses for children through a network of distributers that distributed CKBs products throughout Asia, Canada, and the United States. Based on her involvement in CKB, Kiki Lin is aware that the same and similar marketing materials were used by other Defendants and other CKB promoters as well.

8.      However, Kiki Lin was at least reckless in not knowing that, contrary to the marketing materials and presentations, CKB was an unlawful scheme and not, in fact, a bona fide multi-level marketing company. Defendant Kiki Lin understood that CKB sold its products predominantly to CKB members as part of a "business pack" that included "profit reward points" ("Prpts"), which were purportedly worth US$750. She also understood that the commissions paid to CKB members were generated from recruiting new CKB members, and that no commissions were paid for retail sales of CKB products to non-CKB members.

9.      Kiki Lin convinced investors to invest with CKB with the promise that, as she had been informed by Defendant Shern, Prpts would increase in value exponentially and ultimately could be converted to shares of CKB in advance of an initial public offering ("IPO") of

2

CKB on the Hong Kong stock exchange, which Kiki Lin understood was to occur in 2014.

10.     Based on her involvement in CKB, Kiki Lin is aware that other Defendants and other CKB promoters made the same or similar representations to CKB investors.  In fact, however, Kiki Lin knew that Prpts were not cash equivalents and was at least reckless in not knowing that they could not be converted to real money.   Kiki Lin is aware of no application made by CKB or affiliated entity to be listed on the Hong Kong stock exchange.

**Defendant Kiki Lin's Participation in the Scheme**

11.     Kiki Lin joined CKB as an "affiliate member, also known as an "online marketing angel" ("OMA") in approximately July 2011, after attending CKB promotional meetings, including at least one presentation by Defendant Guo in Los Angeles, California.  After joining CKB as an OMA, Defendant Kiki Lin was placed "down-line" from Defendant Guo, a term used within CKB to indicate where OMAs sit within the structure of the company.

12.     Kiki Lin worked on her own and together with Defendants Shern, Santos, Guo and other CKB promoters to promote CKB and recruit new investors in across the United States, including in New York, Las Vegas, San Francisco, and Los Angeles from at least July 25, 2011 through at least October 9, 2013.  As part of these efforts, Kiki Lin communicated directly with Defendants Shern and Santos in person and through email, and also communicated with Defendant Shern by telephone.

13.     Kiki Lin recruited investors to CKB using a variety of methods, including organizing and speaking at CKB promotional seminars and conferences, posting to the internet videotaped presentations, creating and maintaining a CKB-related website,

3

communicating about CKB by email and telephone, distributing CKB marketing materials, delivering individual investment pitches. These solicitations initially were made primarily to members of the Chinese-American communities and were presented in both Chinese and English.

14.     In these recruitment efforts, Kiki Lin and others that she witnessed, described the purported business of CKB and the enormous profit potential for investors. For instance, Kiki Lin distributed CKB marketing material, which touted CKB's planned IPO and referenced other famous IPOs, such as Google and Facebook. Kiki Lin also used the term "share" or "stock" when referring to the Prpts.

15.     Kiki Lin directed investors to the CKB website, which Kiki Lin knew, at various times, was located at www.ckb168.com and www.ckbmax.com.

16.     From at least September 2012, Kiki Lin was featured as a "Grand Ranking" promoter on the CKB website, along with others, including Defendants Guo, Yao Lin ("Defendant Yao Lin"), Wendy Lee ("Defendant Lee"), Toni Chen ("Defendant Chen"), Heywood Chang ("Defendant Chang"), and Joan Congyi Ma ("Defendant Ma").

17.     The CKB website featured a statement of Kiki Lin, in which she stated that she was initially surprised at the promised returns from CKB, but "when [she] learned the operation secret of this company, [she] recognized that this was a once in a blue moon opportunity to get rich." Kiki Lin also claimed that she had already earned "6 figures value" within her first two months of investing in CKB.

18.     Between October 2011 to at least February 2013, Kiki Lin recorded and posted to the internet CKB promotional videos of herself and others that were taken in New York, San Francisco, and Los Angeles..

4

19.     For instance, Kiki Lin coordinated with Defendants Shern and Santos to create a series of
        videos with Defendants Shern and Santos in which she appeared to "interview" them
        about CKB on the set of a newsroom. Kiki Lin knew that these videos would be shared
        with other CKB investors or prospective investors.

20.     Kiki Lin also operated a website, www.kk1368.com, which was formerly located at
        www.uskk1800.com, through which investors whom she recruited (which she called
        "CKB members") were able to login to a password-protected portion of the site. There,
        Kiki Lin provided CKB investors with additional materials promoting the CKB
        investment.

21.     Kiki Lin did not sell any CKB business pack to any person that did not also receive Prpts
        and an opportunity to earn commissions from recruiting new OMAs.

22.     Kiki Lin knew that she received commissions from CKB only from selling business
        packs to her down-line recruits, or as a result of her down-lines' efforts to recruit new
        investors. Kiki Lin knew that the more business packs purchased by her down-lines, the
        greater her potential commissions

23.     Kiki Lin encouraged investors to purchase large numbers of business packs, each of
        which came with access to one of CKB's courses. Kiki Lin knew that CKB has never
        offered more than seven courses.

24.     Kiki Lin knew that CKB was structured so that she would receive commissions only if
        she and her down-lines recruited new investors who bought business packs, and that retail
        sales of CKB's course to non CKB-members would not entitle her to any commissions.
        Kiki Lin has never sold a CKB course to any non-CKB member.

25.   Kiki Lin knew that commissions would be provided in the form of "points," each worth one US dollar which, unlike Prpts, could be redeemed with CKB for real money. However, Kiki Lin learned that she would lose part of her commission to fees if she did so.

26.   Kiki Lin learned that she could liquidate her commissions without paying fees by recruiting new members to CKB and transferring her commission "points" to the new CKB member in exchange for their cash value. Kiki Lin routinely cashed out her commissions in this way and received payments in various ways, including by check, electronic bank transfer, and cash.

27.   Kiki Lin made no effort to determine the financial qualifications or investment experience of any CKB investor prior to soliciting funds. In fact, in her "Grand Ranking" statement on the CKB website, she boasted that she took money from individuals who had very limited financial resources, including someone she described as a Las Vegas hotel cleaning woman and another she described as a "servant with low income." Defendant Kiki Lin did not provide CKB investors with any financial or other disclosure statements for CKB.

28.   In approximately December 2012, Kiki Lin became aware of a series of articles in the Hong Kong press alleging that CKB might be a pyramid scheme. Kiki Lin did nothing to look into the allegations or otherwise assure herself that CKB was not a pyramid scheme.

29.   At approximately the same time, Kiki Lin became aware that CKB investors had received an email from Cackleberries, the maker of one of the courses offered through CKB, asserting that it was terminating its relationship with CKB. Kiki Lin communicated about this with Defendant Howard Shern. Kiki Lin never contacted anyone at

6

Cackleberries to learn more about the issue. Nonetheless, Kiki Lin sent an email to investors informing them that the email had not come from the real Cackleberries.

30.   Thereafter, Kiki Lin continued to promote CKB to new investors and received commissions from their investments.

31.   Based on her success, Kiki Lin was eventually promoted to the position of "Executive Vice President" for CKB, which is the second highest position that a CKB promoter could hold.

### Defendant Kiki Lin's Misrepresentations to Investors

32.   Kiki Lin made numerous false and misleading statements to investors and potential investors, including, but not limited to, those described in paragraphs 34 through 51 below. Kiki Lin made these statements in order to induce them to join CKB as OMAs and, thereby, earn commissions from their investments. These statements were made through in-person sales pitches, group presentations, videos posted to the internet, and in promotional materials distributed to investors and potential investors.

33.   For instance, Kiki Lin distributed a CKB business card with her name and contact information on it, which said across the top "Can an investment of $1,380 turn into $500,000?" in order to attract investors to CKB.

34.   Kiki Lin also sent numerous emails to CKB investors and prospective investors in which she discussed the potential returns an investor could expect to see. For instance, in one email, Kiki Lin attached a flyer with the same language across the top suggesting that an investment of $1,380 could become $500,000. This flyer stated that an investor would receive $750 in Prpts for every investment of $1,380 and included a chart purporting to show that the Prpts would double in value up to 64 times its original value to become

7

worth $48,000. Yet, Kiki Lin knew that an investor could not actually redeem $48,000 worth of Prpts for $48,000 in actual money.

35. Another flyer circulated by Kiki Lin contained her photograph and contact information and touted "a onehundredfold [sic] profit" potential from investing in CKB.

36. In another email to CKB investors and prospective investors, Kiki Lin attached a document purporting to show that an investment of $1 million in CKB could result in Prpts worth $70.4 million if the Prpts increased by a factor of 32 or $140.8 million if the Prpts increased by a factor of 64. Another document attached to this email purported to show that an investment of $10 million in CKB could result in Prpts worth $736 million if the Prpts increased by a factor of 32 or $1.4 billion if the Prpts increased by a factor of 64.

37. Kiki Lin also posted dozens of CKB-related videos to the internet including one she posted on March 27 2013, in which Defendant Guo told prospective investors at a CKB conference in California that his "marketing team" has generated $100,000,000 in sales revenue. Defendants Santos and Shern were present at the event and can be seen in the video applauding in response to his claim. As one of Defendant Guo's down-lines, Kiki Lin knew or was reckless in not knowing that all the "business packs" she sold to *investors* were being counted toward that $100,000,000 sales revenue number.

38. Kiki Lin never confirmed the accuracy of these reported sales numbers and never saw, nor asked to see any CKB financial statements, audit reports, bank statements, or tax returns.

8

39.     Kiki Lin claimed in yet another recorded presentation that she posted to the internet on

March 27, 2013 that if an investor made a sizable enough investment, he or she could see

returns of up to 600 times.

40.     When Kiki Lin made these statements about the potential returns an investor could

receive from the Prpts, she did not inform investors that Prpts were not cash equivalents

and could not be converted to real money.

41.     Kiki Lin also did not disclose to investors that she had never received any real money

from the Prpts and that, in fact, the only real money she had received from her CKB

investment was from recruiting new investors.

42.     In an undated videotaped presentation that she posted to the internet, Kiki Lin asserted

that an investor could sell all of his or her Prpts in two days, but cautioned that "people

might start to regret" such sales when they see the value continue to climb.  Kiki Lin

further claimed the market had extremely high demand with 100 people wanting to buy

Prpts for every 10 that want to sell.

43.     When Kiki Lin made these statements she failed to also inform investors that, there were

limitations on selling Prpts and that most investors were not able to do so.

44.     Kiki Lin also made numerous statements that CKB was going to go public and that an

investor would have a chance to convert their Prpts into Pre-IPO stock of the company.

For instance, in a video that she posted to the internet on August 4, 2011, Kiki Lin stated

that in a presentation to investors that "in July and August 2014, the company will go

public."

9

45.    In this same video, Kiki Lin asserted that after the IPO, "you will see the profit goes double, four times, eight times, sixteen times, 32 times and because the circulation in the world is very fast, you may even get 64 times."

46.    Similarly, Kiki Lin sent emails to CKB investors and prospective investors in which she discussed CKB's planned IPO and compared it to other famous IPOs.  One email sent by Kiki Lin had as its subject line, in Chinese, "Missed Facebook, don't miss CKB."

47.    In another email, Kiki Lin invited CKB investors and prospective investors to a seminar in which she would explain "why CKB has just confidence that 99.95% it will go to IPO in the emerging company sector in Hong Kong in the middle of 2014."  In that same email, Kiki Lin suggested that CKB shares could rise "ten folds more after the IPO."

48.    In another email to investors, Kiki Lin suggested that "CKB168 stock is projected to rise 10 to 20 times after IPO."  Kiki Lin failed to disclose that this "projection" was really just the product of a casual discussion about CKB among friends.

49.    Kiki Lin never asked to see and, in fact, never did see any evidence that CKB or any related entity took any steps or made any application to go public on any stock exchange.  Yet Kiki Lin did not inform investors and potential investors of these facts when discussing CKB's planned IPO.

50.    Kiki Lin knew or was reckless in not knowing that her statements and omissions relating to CKB, the Prpts, the IPO, and the promised returns were false and misleading.  Defendant Kiki Lin also knew or was reckless in not knowing that accurate information relating to these topics would have been material and important to a reasonable investor.

**Defendant Kiki Lin's Receipt of CKB Investor Funds**

51.    Kiki Lin successfully recruited, directly and through her down-lines, at least hundreds of new investors to CKB.

10

52.     These individuals invested their money through various methods, including sending
        money directly to banks accounts in Hong Kong and China that were under the control of
        Defendants Shem and Leung.  Others directed money to Defendant Kiki Lin or other
        CKB promoters, who then wired the money to Hong Kong or transferred cash wallet
        points to the new investor.

53.     Investors provided their funds to Kiki Lin in various ways, including checks, wires,
        electronic bank transfers, and in as yet undetermined amounts of cash.  Some of these
        funds were deposited into banks accounts held in her own name, and other accounts over
        which she holds signatory authority, including, but not limited to, accounts in the name of
        Relief Defendant USA Trade Group, Inc. and an entity called KK Advertising LLC.

                                          Conclusion

54.     The conduct described above was undertaken by Kiki Lin in connection with the
        purchase, offer, or sale of securities.

55.     The conduct described above constitutes violations of the federal securities laws.

56.     Kiki Lin acted at least recklessly in connection with the violations described above.


        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the
United States of America that the foregoing statements are true and correct to the best of my
knowledge.


        Executed on _____ 1/8 _____, 2015

                                          _____
                                          Chih Hsuan "Kiki" Lin


                                          11

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA }

COUNTY OF __Los Angeles__ }

On __1/8/2015__ before me, __Daisy C. Long__ Notary Public,
    Date                  (here insert name and title of the officer)

personally appeared __Chih Hsuan Lin__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____ (Seal)

> DAISY C. LONG
> COMM. #2043915
> NOTARY PUBLIC-CALIFORNIA
> LOS ANGELES COUNTY
> My Comm. Expires Oct. 31, 2017

_____ *OPTIONAL* _____

Description of Attached Document

Title or Type of Document: __Annex A Admissions of Defendant Chih Hsuan "Koki" Lin__

Number of Pages: _____

Document Date: __1/8/2015__

Other: _____

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| *Plaintiff,* | : |
| | : |
| v. | : 13-cv-5584 (RRM)(RLM) |
| | : |
| CKB168 HOLDINGS LTD., ET AL. | : |
| *Defendants,* | : |
| -  AND  - | : |
| ROSANNA LS INC., ET AL. | : |
| *Relief Defendants.* | : |

## CONSENT JUDGMENT AS TO DEFENDANT CHIH HSUAN "KIKI" LIN AND RELIEF DEFENDANT USA TRADE GROUP INC.

WHEREAS, the Securities and Exchange Commission having filed a Complaint and Defendant Chih Hsuan "Kiki" Lin ("Defendant") and Relief Defendant USA Trade Group Inc. ("Relief Defendant") having entered general appearances; admitted the allegations of the Complaint as to personal and subject matter jurisdiction; executed the Consent attached hereto and incorporated herein for the purposes of settling the Actions before the Court; consented to entry of this Consent Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Consent Judgment; and

WHEREAS Defendant admits to the facts set forth in Annex A to the Consent of Defendant Chih Hsuan "Kiki" Lin.  The Consent of Defendant Chih Hsuan "Kiki" Lin and Annex A are hereby incorporated by reference with the same force and effect as if fully set forth herein.

## I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of this Consent Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of this Consent Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or

2

by use of the mails, directly or indirectly:

    (a)      to employ any device, scheme, or artifice to defraud;

    (b)      to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

### III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of this Consent Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)      Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

    (b)      Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

    (c)      Making use of any means or instruments of transportation or communication in

3

interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

## IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of this Consent Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], by using any means or instrumentality of interstate commerce, or of the mails, to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless registered with the Commission as a broker or dealer or associated with a broker or dealer registered with the Commission.

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant, offering, operating, or participating in any marketing or sales program involving a security, including but not limited to a program in which a participant is compensated or promised compensation solely or primarily (1) for inducing

4

another person to become a participant in the program, or (2) if such induced person induces

another to become a participant in the program.

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

and Relief Defendant shall pay disgorgement of ill-gotten gains, prejudgment interest thereon,

and Defendant shall pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§ 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  The Court shall

determine the amounts of the disgorgement and civil penalty upon motion of the Commission.

Prejudgment interest shall be calculated from October 9, 2013, based on the rate of interest used

by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26

U.S.C. § 6621(a)(2).  In connection with the Commission's motion for disgorgement and/or civil

penalties, and at any hearing held on such a motion: (a) Defendant and Relief Defendant will be

precluded from arguing that Defendant did not violate the federal securities laws as alleged in the

Complaint; (b) Defendant and Relief Defendant may not challenge the validity of the Consent or

this Consent Judgment; (c), the allegations of the Complaint shall be accepted as and deemed

true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of

affidavits, declarations, excerpts of sworn deposition or investigative testimony, and

documentary evidence, without regard to the standards for summary judgment contained in Rule

56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's motion for

disgorgement and/or civil penalties, the parties may take discovery, including discovery from

appropriate non-parties.

5

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant and Relief Defendant shall comply with all of the undertakings and agreements set forth therein.

## VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Consent Judgment.

## IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Consent Judgment forthwith and without further notice.

Dated: _____7/9_____, 2015

s/Roslynn R. Mauskopf

UNITED STATES DISTRICT JUDGE

6