UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

              - against -

CKB168 HOLDINGS, LTD., et al.,

                Defendants.
------------------------------------------------------------------X

<u>MEMORANDUM AND ORDER</u>
13-CV-5584 (RRM) (RLM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Securities and Exchange Commission ("SEC") commenced this action on October

9, 2013, alleging violations of  Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b-5 thereunder;[1] Section 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (3); and

Section 5 of the Securities Act, 15 U.S.C. § 77e.  (Compl. (Doc. No. 1).)  The SEC also alleges

violations of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), and Section 17(a)(2) of

the Securities Act, 15 U.S.C. § 77q(a)(2), against CKB founder Hyng Wai (Howard) Shern and

CKB's United States promoters – Daliang (David) Guo, Yao Lin, Wen Chen Hwang (aka Wendy

Lee), and Joan Congyi (JC) Ma, (collectively "promoters").  (Compl.)  The SEC now moves for

summary judgment against all defendants pursuant to Federal Rule of Civil Procedure 56.[2]  (Mot.

Summ. J. (Doc. No. 311).)  Defendants oppose the motion.[3]  (Shern Opp'n (Doc. No. 327); Leung

---

[1] The SEC has alleged violations of Rule 10b-5(a) and (c) against all defendants, as well as violations of Rule 10b-5(b) against Shern and the U.S. promoters.

[2] The SEC's summary judgment motion against Heidi Mao Liu (aka Heidi Mao) will be addressed in a separate order. Defendants Rayla Santos, Chih Hsuan (Kiki) Lin, Toni Tong Chen, and Cheongwha (Heywood) Chang have settled with the SEC.  Additionally, on July 29, 2015, the Clerk of Court entered default against entity defendants CKB168 Holdings Lts.; WIN168 Biz Solutions, Ltd.; CKB168 Ltd.; CKB168 Biz Solution, Inc.; and Cyber Kids Best Education, Ltd., which are not represented by counsel.

[3] As discussed in the Court's August 12, 2015 Order, *pro se* defendants and CKB founders Shern and Leung were precluded from "offering testimony, affidavits or declarations in connection with a dispositive motion or trial."  (Doc. No. 262.)  Nonetheless, Shern and Leung both submitted affidavits in opposition to the SEC's motion, though not 56.1 statements despite being provided with the requisite notice under Local Rule 56.2.  While Shern and Leung additionally

Opp'n (Doc. No. 328); Guo, Lee, Ma, Yao Lin Opp'n (Doc. No. 353).) For the reasons below, the SEC's motion is granted.

## BACKGROUND[4]

Defendants are the architects and top U.S. promoters of "CKB," a multi-national pyramid scheme made of several collective entities, purported to be a legitimate multi-level marketing company ("MLM") selling educational software. Defendants Shern, Leung, and Santos were CKB founders. Defendants Guo, Lee, Ma, Yao Lin, Kiki Lin, Chang, Chen, and Mao were among CKB's top promoters. In just two years, defendants collectively earned approximately millions in commissions by recruiting investors with false promises of investment returns and profitable stock.

### I.     The Purported Business

Defendants described CKB as a profitable provider of web-based educational software for children. The products functioned like a video game, with animation and interactive features. Through 2012, CKB had three software products; however, by the time this suit was filed, CKB had seven unique software products. (SEC's 56.1 at ¶¶ 20–22.) To use a product, a purchaser had to obtain a license from CKB before accessing the product via the internet. (SEC's 56.1 (Doc. No. 311-2) at ¶¶ 18–19.) The SEC maintains that the majority of software licenses issued were never used. (SEC's 56.1 at ¶ 23.)

CKB and its promoters earned money by recruiting investors, known as Online Marketing Angels ("OMAs"). OMAs joined CKB by purchasing $1,380 "business packs," which contained one software license; "profit reward points" ("Prpts"), which defendants claimed had a cash value of $750 and could be converted to stock in the future; and access to a password-protected account (a

---

did not submit memoranda of law in opposition to the SEC's motion, the Court has considered the legal arguments contained within the affidavits. Shern and Leung are proceeding *pro se*. As such, their arguments are construed liberally, and to raise in their favor the strongest inferences and arguments possible.

[4] The following facts – drawn from the parties' Local Rule 56.1 statements and the submissions filed in connection with this motion – are undisputed unless otherwise noted and are taken in the light most favorable to plaintiffs. *See Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003).

"back office account") on the CKB website, which contained each OMA's personal CKB financial information, Prpt pricing, and CKB promotional materials.  (SEC's 56.1 at ¶ 30.)  CKB's compensation plan, called the "Dynamic Rewards Plan," offered no incentive for OMAs to sell CKB's products to retail purchasers.  Instead, it set forth a system of direct and indirect commissions earned solely by recruiting other OMAs.  (SEC's 56.1 at ¶ 54.)

Defendants promoted CKB through seminars, conferences, email, a corporate webpage, individually maintained webpages, internet postings on sites such as YouTube, and in-person solicitations.  These promotional efforts did not focus on CKB's software, rather they promoted CKB as a no-risk business opportunity to make enormous investment returns.[5]  (SEC's 56.1 at ¶ 24.)  For example, in a presentation recorded and posted on YouTube, Chang compared CKB to prominent companies with successful initial public offerings ("IPOs") and talked at length about how an investment in CKB could quickly multiply.  In the video, Chang did not attempt to sell CKB's actual software, offering only platitudes about CKB's educational mission.  (SEC's 56.1 at ¶ 25.)  In another video recording, Guo promotes CKB to potential investors, one of whom can be heard saying to Guo: "We're attracted by the stocks, and not many people are using the products really."  (SEC's 56.1 at ¶ 28.)

Similarly, in a testimonial posted on the CKB website, Ma talks about how she profited from the CKB business opportunity.  (SEC's 56.1 at ¶ 26.)  CKB promotional literature also emphasizes the business opportunity, not the products.  As one hand-out states:

> Is It Possible to Turn $1,380 Investment To $500,000?
> . . .
> Return on Investment: With a courseware purchase, investing $1,380 in education, you receive a Pre-IPO privilege of PrPt for FREE, an equivalent of $750 in value,

---

[5] Guo, Lee, Ma, and Lin "admit that they promoted CKB through" the various platforms described above, but do not address CKB's statement that such promotions focused on the "business opportunity" of CKB.  (Defs.' 56.1 (Doc. No. 353-1) at ¶ 24.)  Nonetheless, the record of evidence before the Court clearly supports the SEC's statements, with the exception of their applicability to Leung.

salable, redeemable, and convertible to company stock. Your investment will be doubled, quadrupled and continue to grow in size to 8 times, 16 times . . . till IPO.

(SEC's 56.1 at ¶ 27.)

In fact, CKB never sold its software products directly to any retail customers. The majority of licenses were purchased as part of the business pack sold to OMAs. In only a few instances did any promoter ever make a sale of a CKB license directly to a retail customer. This was such a rarity that CKB's proceeds show no revenue attributable to retail sales of its software. (SEC's 56.1 at ¶¶ 29–32.)

## II.     Defendants' False Claims that OMAs Would Own CKB Stock and that CKB Would Have an IPO

Defendants typically referred to OMAs as "investors" and described the purchase of a business pack as an "investment" in CKB. Among other promotional tactics, defendants stated that OMAs would see significant returns on their investment, referred to as "pre-IPO shares," when CKB went public. (SEC's 56.1 at ¶¶ 33, 39.) Promoters initially told potential investors and OMAs that OMAs would directly acquire stock. Though CKB did issue stock certificates to early OMAs, it attempted to rescind such certificates in 2011 upon learning they were unlawfully issued. Yet, even after, Shern and the promoters continued to claim that OMAs could convert Prpts to stock. (SEC's 56.1 at ¶¶ 35–36.)

In a 2012 presentation, Shern told potential investors, "when the company goes public [in 2014], it could be up to eight times the rate of return. Your investment of $56,000 will become $420,000." Similarly, in a July 2012 email, Lee sent a document to an OMA that stated, "CKB168 will be publicly listed in 2014 and is estimated to undergo splitting for four times before listing." In a November 2012 email, Ma made the same representation that CKB would have an IPO in 2014. (SEC's 56.1 at ¶ 40.)

Despite these claims, CKB never provided stock to OMAs in exchange for Prpts. (SEC's 56.1 at ¶¶ 36–38.) While defendants frequently claimed they owned "shares" in CKB, only Yao Lin ever received a purported stock certificate, which could not be sold or transferred. (SEC's 56.1 at ¶¶ 33, 37.)

Along the same lines, despite defendants' claims of an imminent IPO, CKB, Shern, and Leung made no preparations to go public. (SEC's 56.1 at ¶¶ 41, 160.)

### III. Defendants' False Claims that Investors Would Make Active and Passive Profits

Defendants claimed that OMAs could make large, rapid returns on their investments. Defendants divided these returns into two categories: (a) "active" or "dynamic" returns and (b) "passive" or "static" returns. (SEC's 56.1 at ¶ 42.) However, OMAs could only realize a profit through recruitment commissions, the majority of which were realized by defendants themselves.

#### a. Active Returns

As set forth in CKB's Dynamic Rewards Plan (the "Plan"), OMAs could only make actual money by recruiting new OMAs to buy business packs. The Plan provided no incentive for OMAs to make retail sales. Rather, the Plan rewarded OMAs that successfully recruited new OMAs with commissions, which appeared in the OMA's back office account.[6] (SEC's 56.1 at ¶¶ 52–54.)

Under the Plan, CKB rewarded OMAs in two instances: (1) when they established "downlines," new OMAs who they or their existing downlines recruited, and (2) when an existing downline purchased additional business packs. Generally, OMAs could profit from investments up to ten levels below them. Defendants, as top-ranked OMAs, could earn commissions from deeper levels. This pyramid structure incentivized OMAs to grow their business by finding new investors.

---

[6] Guo, Lee, Ma, and Lin dispute the SEC's statement that the *only* way an OMA earned money was through commissions for recruiting other OMAs. (Defs.' 56.1 at ¶ 52.) However, they have put forth no evidence of other mechanisms for an OMA to earn money, and, on review of the evidence, most notably the Dynamic Rewards Plan, there appears to be no other way for an OMA to earn income. (Dynamic Rewards Plan (Doc. No. 312-1 at 124–133 (ECF pagination).) *See SEC v. Greenstone Holdings, Inc.*, No. 10-cv-1302 (MGC), 2012 WL 1038570, at *9 (S.D.N.Y. Mar. 28, 2012) (finding no material disputes of fact where defendant's "assertion is contradicted by the evidence").

As discussed above, defendants' marketing efforts, as well as the training they provided to downlines, focused almost exclusively on the investment opportunity.[7]  (SEC's 56.1 at ¶¶ 55–59.)

### b.  Passive Returns

Defendants' claims of passive returns referred to the accumulation and allegedly increasing value of Prpts.  (SEC's 56.1 at ¶ 45.)  Defendants told investors that Prpts would rapidly increase in value and never decrease.  OMAs were given Prpts with a purported value of $750 in their business packs, and CKB claimed that their value would increase as a function of CKB's business pack sales. Defendants stated that so long as CKB continued to attract new OMAs, CKB would increase the value assigned to the Prpts.  (SEC's 56.1 at ¶ 46.)

Every few months, CKB would "split" its Prpts, thus doubling each OMA's Prpt holdings. (SEC's 56.1 at ¶ 47.)  Though defendants represented the value of Prpts in terms of "dollars" and claimed Prpts had a "market value," OMAs were never actually able to realize a cash value for their Prpts.  (SEC's 56.1 at ¶¶ 48–49.)  As defendants knew, or at best recklessly ignored, Prpts could not be converted to cash.[8]  (SEC's 56.1 at ¶ 50.)  Prpts could only be exchanged for more business packs or traded by OMAs on a Prpt exchange accessed through the OMA back office accounts. However, because there were effectively no buyers on the back office Prpt exchange, OMAs could

---

[7] Guo, Lee, Ma, and Lin "admit that they encouraged 'new and existing OMAs to "grow" their business,'" and do not dispute the SEC's statement that marketing efforts and training focused almost exclusively on the investment.  (Defs.' 56.1 at ¶ 59.)  Nonetheless, the record of evidence before the Court clearly supports the SEC's statements.  *See Greenstone Holdings*, 2012 WL 1038570, at *9.

[8] Defendants dispute this claim.  See *infra* Section IV for a discussion of each defendants' knowledge.  Additionally, defendants dispute the Kam Lee declaration relied upon by the SEC for such figures, arguing that the SEC has produced no evidence supporting its claims of CKB's financials and OMA accounts.  However, the record contradicts this argument.  The back office data used by Kam Lee was obtained from the foreign defendants in response to Judge Mann's discovery order, and no other defendant produced their own back office data to contradict such records.  Once the SEC was able to access evidence, the SEC notified the Court and offered all parties copies.  Though not relied upon by the Court in its ultimate determination, the evidence is admissible as summary evidence under Federal Rule of Evidence ("Rule") 1006 and as statements against interest under Rule 804(b)(3).  *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993) ("Summary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party."); *John Paul Mitchell Sys. v. Quality King Distrib., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) ("[T]he act of production implicitly authenticated the documents.") (collecting cases); *see also United States v. Gupta*, 747 F.3d 111, 127–28 (2d Cir. 2014).

not use the exchange to trade their Prpts for cash.  (SEC's 56.1 at ¶ 51.)  In effect, Prpts were worthless.

### c.  Defendants Earned the Vast Majority of Commissions

The top 1% of OMAs earned 61% of all commissions.[9]  Out of 65,883 total OMA accounts, the top 12 (or .018%) earned nearly 13% of all commissions.  Guo, Yao Lin, Lee, Shern, Leung, Kiki Lin, JC Ma, and Toni Chen were among those top 12 accounts.  More than half of all OMA accounts received no commissions whatsoever.  (SEC's 56.1 at ¶¶ 60–61.)  Defendants and a few select others collected millions, while nearly everyone else incurred losses.  The SEC alleges that such a distribution of winners and losers was inherent in the Dynamic Rewards Plan.  (SEC's 56.1 at ¶¶ 60–61, 64–66.)

### d.  Other Investors Felt Significant Losses on their Investment

Other OMAs, promised enormous returns by defendants, realized significant losses.  Two examples are detailed below:[10]

#### 1.  Harry Lee

In August and September 2012, Mao recruited Harry Lee and his mother to invest in CKB. Mao, with the help of her sister, lauded CKB as a great company for Harry Lee and his mother to invest in.  At Mao's invitation, Harry Lee attended a promotional seminar on September 4, 2012. There, Wendy Lee described CKB as a legitimate company selling children's educational products. Wendy Lee told the attendees that CKB would soon go public and that OMAs would be awarded Prpts that would rapidly multiply and could be converted to pre-IPO stock.  Mao also spoke at the seminar.  There, Harry Lee stated that Mao discussed the profits she had made from her CKB

---

[9] Many defendants held more than one account.  Holding multiple accounts enabled an OMA to function as his or her own downline.  (SEC's 56.1 at ¶ 63.)

[10] Guo, Lee, Ma, and Lin argue that "bare declaration[s]" of the victims listed below "should be afforded no weight" because they were not deposed by counsel for any defendants in this action.   (Defs.' 56.1 at ¶¶ 101, 103, 111.) However, defendants offer no legal support for this statement nor reasons why such victims were not deposed by counsel.

investment. (SEC's 56.1 at ¶¶ 105–06.) Based on those representations, Harry Lee's mother invested $55,200, a significant portion of which came from her retirement account, in CKB and gifted the investment to Lee for his wedding. (SEC's 56.1 at ¶ 107.)

After his mother's investment, Harry Lee continued to attend CKB presentations. One such presentation, hosted by Wendy Lee at Mao's home, was designed to train new OMAs to recruit other OMAs. There, Wendy Lee told attendees to promote CKB by focusing on the impending IPO and the opportunity to double or triple an investment. No instruction on how to sell the software was provided. (SEC's 56.1 at ¶ 108.)

Shortly thereafter, Harry Lee began to question his investment in CKB. He asked Mao how CKB incurred revenue without making retail sales. He also stated that her claims that he would be able to redeem his Prpts for cash were false. Mao responded that it was important to "believe" in CKB and urged Lee to recruit downlines. (SEC's 56.1 at ¶ 109.)

In July 2013, Harry Lee attempted to convert his Prpts to 15,619 shares of CKB stock. He received two responses from CKB acknowledging his request, but he never received stock certificates. (SEC's 56.1 at ¶ 110.)

### 2. Richard Tuan

Richard Tuan, a retiree, attended a 2012 CKB promotional event in California, at which Shern, Santos, and Lee presented. At the event, defendants claimed that CKB would soon go public in Hong Kong and that the cash value of Prpts would increase dramatically. (SEC's 56.1 at ¶ 112.)

In July 2012, Tuan invested $15,000. Shortly thereafter, Tuan attempted to convert his Prpts to stock. On July 11, 2013, CKB told him that in exchange for his Prpts, he would receive 6,082 shares of CKB stock. In November 2013, Tuan contacted Lee as he was confused about the instructions sent by CKB regarding his stock order. Despite the fact that the SEC had already initiated this suit against CKB and Lee, Lee told Tuan that he needed to provide additional

information to CKB and would be required to pay a $50 fee to obtain the certificates. She did not mention the pending law suit.[11]  (SEC's 56.1 at ¶¶ 113–16.)

## IV.  Defendants Conduct and Roles in CKB

### a.  Shern

In January 2011, Shern described the concept of what would become CKB to Santos. In April 2011, Shern and Leung opened bank accounts to conduct CKB business. Together they directly and indirectly controlled CKB's bank and securities accounts. (SEC's 56.1 at ¶¶ 117–18.)

After helping to create CKB, Shern acted as CKB's International Marketing Director and as an OMA, despite being warned that it was a "conflict of interest" for a CKB director to be an OMA. (SEC's 56.1 at ¶ 142.) As International Marketing Director, Shern, with a select few others, was responsible for designing and implementing the CKB investment plan, including drafting the plan and setting up the back office accounts. On March 10, 2011, Santos emailed Shern a draft of Policies and Procedures for CKB. (SEC's 56.1 at ¶ 119; 3/10/11 Santos Email (Doc. No. 319-1) at 49 (ECF pagination).) The draft explicitly stated:

As a legitimate MLM Company
- [CKB] pays Distributors commission based on product sales, NOT on recruiting people.
- [CKB] does not require individuals to buy products in order to become a Distributor. The cost is a one time sign-up fee that is reasonable and refundable.

(Draft Policies and Procedures (Doc. No. 319-1) at 51 (ECF pagination).) Despite being presented with this document highlighting the commission structure of a "legitimate MLM," Shern created and implemented the Dynamic Rewards Plan, which compensated OMAs exclusively for recruiting new investors. (SEC's 56.1 at ¶ 121.)

---

[11] Lee denied having knowledge of the SEC lawsuit in November 2013. (Defs.' 56.1 at ¶ 116.) However, Lee was an active case participant by November 2013. For example, counsel for Lee filed appearances on the docket on October 22 and November 1, 2013. (Doc. Nos. 31, 29.) On November 9, 2013, Lee signed a verified accounting, which was submitted to the Court. (Doc. No. 47-7.) Accordingly, the Court finds that Lee was aware of this case in November 2013. *See Greenstone Holdings*, 2012 WL 1038570, at *9.

Similarly, CKB required OMAs to purchase software licenses through their business packs. Yet, most OMAs had no need for the software and those that attempted to use it often had problems. In late 2011, one OMA told Shern directly that the product was "garbage." On another occasion, Shern directly acknowledged a flaw in the software that required users to complete the same lesson for three days before being able to proceed to the next lesson. Nonetheless, Shern marketed CKB as a legitimate, growing company selling an advanced and desirable product. (SEC's 56.1 at ¶¶ 125, 127.)

On many occasions, Shern traveled to the U.S. to promote CKB, including to present at seminars and other events. In a testimonial posted on the CKB website, Guo said that Shern's "US trip helped boosting our sales a lot." Both during these trips and at other times, Shern served as a primary source of information and instruction for promoters. (SEC's 56.1 at ¶¶ 122–24.)

Shern knew, and repeatedly discussed, that the promoters and others were describing CKB as an "investment" and claiming that investors would get CKB "shares" or "stock." In a YouTube video he posted on May 12, 2012, Shern stated that the "idea" of CKB was "to do these educational programs and then to provide opportunities for the regular public to become the holder of the initial stocks even before the company went public." In February 2013, Shern used a promotional flyer for an upcoming presentation that stated that participants would learn "how [they] could possess the initial non-public shares of CKB group . . . . How CKB can be the company to make millions for its shareholders." (SEC's 56.1 at ¶¶ 128–29, 132.) Yet starting in 2011, Shern had repeatedly been told that it was unlawful for CKB to sell "stock." Shern even acknowledged in a November 26, 2012 email to Kiki Lin that the promoters "may have . . . promised too much" and "members were misled." Shern even acknowledged that it was "illegal" for CKB to distribute stock. (SEC's 56.1 at ¶¶ 131, 133–35.)

Despite knowing that CKB could not sell stock, Shern continued to promise OMAs and potential investors that they could become shareholders by converting their Prpts to stock. At one of his U.S. presentations, he explained, "we have ways to convert things into stocks and give it to you." In another presentation, Shern stated that "by accumulating [Prpts] you could change them into stock . . . . So by doing this we make ourself a legal operation. You know, sometimes people will say, if you sell stocks – initial stocks, it's illegal, but we are legal." Even after acknowledging that "members were misled," Shern continued to pay commissions to promoters and accept investments from their downlines. (SEC's 56.1 at ¶¶ 134–35, 138.)

Shern also continuously told investors that CKB would soon go public. In one presentation, he stated "in the next 24 months the value of your initial stock will increase . . . so for the next two years, and also during the first three to five years after the company gets public, we will get the value of the stock increased." As late as June 2013, Shern edited and consulted on a revised compensation plan that still claimed that OMAs could convert their Prpts into stock. (SEC's 56.1 at ¶¶ 136–37.)

When confronted with allegations that CKB was a pyramid scheme, Shern led CKB's efforts to suppress such allegations. In an email, Shern urged OMAs "to protect the name of the company" and aggressively deny any allegations. Shern also hired a consultant to eliminate references to the allegations from internet search results for CKB. In a December 2012 response to allegations that CKB was a fraud, Shern edited and approved a response letter stating that CKB sold "cutting-edge educational products" and it "sell[s] real products, generate[s] real sales, [and] produce[s] real results." The same response also stated that CKB would go public "in the next few years" and was not a "wild claim to squeeze money out of unsuspecting members." (SEC's 56.1 at ¶¶ 148–49.) As the accusations continued, Shern took steps to distance himself from CKB. By February of 2013, Shern disclosed to Santos that as a result of the pyramid scheme allegations, he had been "busy for

two months' time working with lawyers and accountants to restructure the company. And that is why now we are not owners of CKB." Nonetheless, even after the SEC initiated this lawsuit in October 2013, Shern continued to communicate with and accept money from OMAs, and even held a webinar accessible to OMAs in which he described "the future of the company." (SEC's 56.1 at ¶¶ 151–52.)

### b. Leung

Leung, one of CKB's founders, acted as CKB's Chief Financial Officer ("CFO"). In a CKB promotional brochure, Leung was credited with creating CKB's "management structure." The same brochure recounted Leung's background in banking and wealth management and claimed that Leung has experience taking companies public. (SEC's 56.1 at ¶¶ 153, 165.)

As CFO, Leung was chiefly responsible for managing CKB's finances, collecting funds from investors, paying salaries and other business expenses, and paying commissions to OMAs. She controlled bank accounts, some of which she opened with Shern, and signed checks on behalf of CKB. In February 2012, she also signed a stock certificate on behalf of CKB for Yao Lin. (SEC's 56.1 at ¶¶ 156–57, 166–67.) Leung was also widely understood to be in charge of CKB's finances. She communicated directly with OMAs regarding payment issues. She frequently adjusted accounts, signed checks, modified transactions, and gave instructions to OMAs about where to send their money and other steps to take. Leung was familiar with the Dynamic Rewards Plan and the back office. (SEC's 56.1 at ¶¶ 153, 157–58.)

Even after Leung was confronted with allegations that CKB was a pyramid scheme and warned that it was illegal to sell stock, Leung continued functioning as CKB's CFO and diverting funds into her own account. (SEC's 56.1 at ¶¶ 161–63.)

### c. Guo

Guo was one of CKB's highest ranking promoters due to his success in recruiting direct and indirect downlines.[12]  Guo was also one of the earliest OMAs to invest in CKB, in May 2011.  For his successful recruitment efforts, CKB awarded him a $250,000 bonus.  (SEC's 56.1 at ¶¶ 168, 193.)

Guo traveled throughout the U.S. and China to promote CKB and recruit new OMAs.  In one video, Guo stated that his "sales group," referring to his direct and indirect downlines, was responsible for "$100 million of sales revenue."  In testimonials posted on the CKB website, both Lee and Kiki Lin state that they were recruited by Guo.  As part of his recruitment efforts, Guo provided his downlines with CKB promotional material.  (SEC's 56.1 at ¶¶ 170, 172.)

Like other defendants, Guo made repeated statements to potential investors that CKB would soon go public.  In a presentation, he stated that the IPO would happen in 2014, and added, "So, yes, today I'm promising that we definitely can go public."  In a testimonial posted on the CKB website, Guo wrote that he had been "rewarded 500K USD and lots of shares" and that "[h]aving such a big portion of shares and Prpts given out are another attractive point of CKB168."  Guo also repeatedly referred to Prpts as "shares" and "stocks" and told potential investors that OMAs are "holders of initial stocks."  In presentations, Guo compares OMAs who help Prpts to pre-IPO investors in Google, New Oriental, and Baidu.[13]  (SEC's 56.1 at ¶¶ 173–175.)

Guo also told investors that they would enjoy enormous, risk-free returns by investing in CKB.  In one video, he stated that "before going public, [Prpts] will only grow and never fall."  In another video, he told investors that OMAs can "sell our Prpt at the back [office] and convert it to

---

[12] An indirect downline refers to a new downline started by an OMA's existing downline.  CKB resembles a pyramid structure because OMAs are promoted and compensated for recruiting done by existing OMAs.  According to the SEC, Guo occupied the same pyramid level as Shern and Leung.  (SEC's 56.1 at ¶ 193.)

[13] Guo disputes that he "promised" that CKB would go public and argues that he understood that CKB *could* go public.  (Defs.' 56.1 at ¶ 173.)  Nonetheless, the undisputed record is clear that Guo represented to investors that CKB *would* go public.  *See Greenstone Holdings*, 2012 WL 1038570, at *9.

money."  He also compared the allegedly risk-free CKB approach with investments in purportedly riskier public companies, where the value of the investment may fluctuate.  At other times, Guo purported to explain "why there is no risk for [CKB] investors."  Guo made similar claims as to the investment after an IPO.  He stated that "after going public . . . the value of Prpt will increase by 50 times."  Along the same lines, he also claimed that CKB's "stock value would be increased dozens of times or even hundreds of times."  (SEC's 56.1 at ¶¶ 179–81, 183.)

In addition to telling OMAs and potential investors that CKB was a profitable, risk-free investment, Guo also explained CKB's structure.  In a variety of contexts, he explained that OMAs earned commissions by actively recruiting new investors and benefited indirectly when their downlines successfully recruited.  In one video, Guo walked OMAs through arranging a downline pyramid in order to maximize commissions.  (SEC's 56.1 at ¶ 184.)

Even after being confronted with signs and accusations that CKB was a "scam" and a pyramid scheme, Guo continued to promote CKB and accept commissions.  By October 2012, Guo was aware that CKB had been accused of being a pyramid scheme when he received an email from Shern denouncing the claims and imploring the top promoters to attack CKB's critics.  Guo made no investigation into these claims, nor did he verify any of the promotional claims he made to potential investors.  He never acquired, or even asked for, any internal CKB financial statements or other disclosures.  Instead, he continued making the same claims to investors as detailed above.  In one video, potential investors can be heard questioning CKB's legitimacy.  In response, Guo refuted any claims that CKB was not legitimate and even claimed to have given one investor a personal guarantee that a CKB investment would only increase in value.  Similarly, despite the fact that Guo never received stock and, in fact, wasn't aware of anyone who had received stock certificates, he

told OMAs and potential investors that he already had CKB stock.[14]  (SEC's 56.1 at ¶¶ 175–78, 182–83, 185.)

Guo knew that CKB that Prpts could not actually be converted to cash and that CKB was not actually risk-free while making such claims to investors.  By April of 2013, someone at CKB even told him that it was "inappropriate" to denote Prpts in dollars.  Guo also later admitted that his claims that CKB was risk-free were only his "hope" and his "personal view."  He had not done anything to verify such representations.  Guo also was aware that he earned no commissions and CKB offered no incentives for retail sales.  Though he collected millions in commissions for recruiting new OMAs, he made only 15 or 16 software sales to non-OMAs, who were exclusively his family members in China.  His promotional efforts focused entirely on recruiting new OMAs with statements that he knew were false.  (SEC's 56.1 at ¶¶ 184, 187–90.)

### d.  Lee

Lee became an OMA in July 2011.  After joining CKB, she regularly hosted promotional events at her Los Angeles area home.  Her OMA account ranked among the top 28 out of over 65,000 worldwide OMA accounts.  (SEC's 56.1 at ¶¶ 65, 194–95.)  Lee stated that she did not have "any goals" for selling the CKB software.  (Lee Dep. (Doc. No. 312-1) at 210:6–12 at 140 (ECF pagination).)

Lee promoted CKB on her own website, estockclub.com.  Though the site was publically accessible, Lee noted that it was in its Beta (pre-launch) form.[15]  (Defs.' 56.1 at ¶ 196.)  There, Lee gave financial advice and information about CKB.  Other promoters directed OMAs and potential investors to Lee's website, where Lee posted CKB materials, meeting times, and promotional

---

[14] Guo states that he "never represented that CKB was 'issuing stock.'"  (Defs.' 56.1 at ¶ 176.)  However, he admits that he referred to Prpts and stock interchangeably when talking to OMAs and potential investors.  (Defs.' 56.1 at ¶ 175.)  *See Greenstone Holdings*, 2012 WL 1038570, at *9.

[15] Lee "denied that she intended this information to be for public consumption."  (Defs.' 56.1 at ¶ 196.)  However, this is immaterial.  Lee was aware the public could access her website and admits to pointing her downlines toward her website.

literature for site visitors. Lee also listed the website address on her CKB business card. (SEC's 56.1 at ¶¶ 196–97.)

One presentation posted on Lee's website, extolled CKB's business plans and invited visitors to "[j]oin us and become a CKB OMA." The presentation made several claims about Prpts, including that "USD 750 [of Prpts] will become USD 3,000 within six months to one year." It listed Prpt prices on various days and added the "value of each [Prpt] has increase[d] from USD 0.024 on Jan. 1, 2012 to USD 0.169 on Sep. 21, 2012, with a return of 8 times within 9.5 months! In this way, there might be a return on 8–16 times before CKB gets listed in 2014." A flier posted on Lee's website claimed that "CKB's market value is USD 2.88 billion," and that "the first batch of 200 million Prpts are allocated, CKB has sold about 360,000 courses with the revenue of about ESD 432 million and the profit of about USD 36 million." The flier also claimed that "each Prpt is equivalent to about USD 2.16." (SEC's 56.1 at ¶¶ 198, 200.)

In presentations and in informal conversations with OMAs and potential investors, Lee made similar claims about Prpts. For example, in September 2012, she told potential investors that the value of Prpts would rapidly multiply and that the Prpts could be converted to pre-IPO stock. In a July 2016 email to an OMA, Lee described future increases in Prpt value and attached a chart showing how an investment of $124,000 could rapidly become over $4 million in Prpts. Lee circulated similar charts to other OMAs and potential investors. Such charts did not disclose that Prpts did not actually have a cash value and could not simply be exchanged for cash, as Lee understood.[16] (SEC's 56.1 at ¶¶ 80, 101, 106, 202, 207–11.)

Lee also told OMAs and potential investors that CKB was taking steps to go public. Lee told OMAs that they could convert their Prpts to stock and become investors in, and have ownership

---

[16] Lee disputes that she knew Prpts could not be exchanged for cash. (Defs.' 56.1 at ¶ 211.) However, she testified that investors could not exchange their $750 of Prpts to cash and that Prpts were "not something that could be cashed out immediately." *See Greenstone Holdings*, 2012 WL 1038570, at *9.

of, CKB. Another presentation on her website stated that Prpts could be "[u]sed to exchange for a share certificate," and that, if Prpts are "used to exchange for a share certificate, annual dividends can be enjoyed." Lee claimed that these holdings would become valuable upon CKB's imminent IPO. Lee also distributed materials and charts with similar claims to potential investors. (SEC's 56.1 at ¶¶ 113–16, 199, 202.)

Like other defendants, Lee continued to promote CKB and accept commissions despite accusations and signs that CKB was a fraud. By fall of 2012, Lee knew that CKB had been accused of being a pyramid scheme by various media sources, bloggers and even frustrated OMAs. She discussed these allegations with other defendants and she was part of an October 2012 email exchange in which Shern denied the allegations. Nevertheless, she did nothing to independently assess the allegations. In November 2012, Shern himself warned Lee that she was making false claims about CKB and he asked her to temporary take down her website, explaining that "there is information inaccurate and will be used to by . . . SEC against" CKB. Though it is unclear when, or for how long, Lee's website was taken down, evidence shows it was active in October 2013. (SEC's 56.1 at ¶¶ 133, 213–14.)

Lee also never investigated CKB's purported efforts to go public. At one point Lee actually attempted to convert her Prpts to stock, but never received any stock certificates. Despite this, Lee never verified her claims that OMAs could become shareholders of CKB, which she repeatedly made to OMAs and potential investors. Lee also repeatedly told OMAs and potential investors that Prpts could be converted to cash, despite knowing that OMAs would have to wait in line to find a buyer on the back office exchange. In communications with potential investors, Lee described Prpts as actual CKB income even though she know the potential investors were not aware of the difference between the valueless Prpts and the actual commissions paid out. (SEC's 56.1 at ¶¶ 202–04, 206, 211–12.)

### e. Ma

Ma became an OMA in May 2012 and, within ten weeks, achieved the level of Executive Vice President due to her success. One of her OMA accounts was among the top 112. Prior to joining CKB, Ma had been a licensed securities professional. In her CKB testimonial, Ma claimed, "I am experienced and licensed in both the financial services and real estate industries," and represented that she had "learned" and "studied" CKB's business. (SEC's 56.1 at ¶¶ 289–91.) Ma often worked in coordination with Lee, Mao, Chang, and Chen, whom she referred to as her "team." Ma would direct OMAs and potential investors to Lee's website for CKB promotional information. Ma also attended recruiting events with her team and implored them in emails to work hard in recruiting new OMAs. During a trip to China, she sought to arrange CKB promotional events and speakers with Chang and Chen. (SEC's 56.1 at ¶¶ 292, 294–95.)

In her CKB testimonial and in numerous communications with other OMAs and potential investors, Ma stated that she was a shareholder of CKB. In her testimonial, Ma expressed regret that had she "made a higher investment, [she would] have acquired many more shares at a lower price." In a November 3, 2012 email to OMAs, she wrote that "[t]hose selling shares and dividends would regret what . . . few shares they own later." (SEC's 56.1 at ¶ 297.)

Ma also made repeated representations that a CKB IPO was imminent. In a June 2, 2013 email to OMAs, she wrote, "June marks the last month of CKB stock lock-up. If you or your friends want to catch the last flight before public listing, please lock up all points before the end of June." At the bottom of the email, in bold, oversized letters, Ma wrote, "[o]ne without stocks cannot become rich and one without initial stocks cannot muster enormous fortune." In another email, Ma wrote, "Oct 1 is around the corner, this will be the last chance to invest and get free shares." In a January 22, 2013 email, Ma wrote, "[p]rospective investors in CKB186 need to complete investment prior to the end of April." On March 19, 2013, Ma sent another email to

OMAs stating that CKB had changed its website "[t]o satisfy requirements of the listing of the parent company." (SEC's 56.1 at ¶¶ 298–300, 303.)

Ma also told OMAs and potential investors that they could enjoy huge returns on their Prpts, despite knowing they were valueless. For example, Ma emailed a chart to Mao and other OMAs depicting a rapid 112% return on an OMA's initial investment and specified a "market value" for the Prpts in dollars. Along the same lines, Ma sent emails to OMAs notifying them that they could purchase more business packs before a Prpts "split." In one email, she itemized the enormous returns a new OMA could enjoy, writing, "[i]f 81 orders are concluded before the end of September, the company will gift [Prpts] worth . . . 379,818 shares for X [times] 0.163 = $61910. In case of increases by 16 folds, the value would be $1 million at the time of the public listing, exclusive of dividend." However, Ma knew that Prpts did not have cash value and could not be converted to cash. Although she believed that OMAs could use Prpts to purchase software licenses, and then sell those licenses for cash, she never sold licenses in this manner. Ma was aware that the only way to earn real cash was for her or her downlines to sell business packs. Ma only ever sold a few licenses to retail purchasers. (SEC's 56.1 at ¶¶ 304–07, 309.)

By October 2012, Ma was aware that CKB had been accused of being a pyramid scheme. Along with other defendants, Ma was copied on an email exchange between an OMA and Shern, in which Shern denounced allegations that CKB was a pyramid scheme. Like Shern, Ma described similar allegations as sabotage. In a December 2012 email to an OMA, Ma wrote, "[t]here are some he[ar]says about the company, which are made intentionally to sabotage our Company. There are also people doubting about the operation model of CKB168 . . . . One company has created numerous millionaires with this model." Yet Ma did nothing to investigate the allegations she denounced. Ma claims that, instead, she accepted Shern's explanation that the accusations were motivated by jealousy. After learning of the allegations, Ma continued to promote CKB, to

encourage her downlines to recruit new investors, to accept commissions and cash, and to permit her testimonial to be used on the CKB website. (SEC's 56.1 at ¶¶ 310–13.)

### f. Yao Lin

Lin became an OMA in May 2011, after being recruited by Guo. Lin's top OMA account ranked among the top 28. Prior to becoming an OMA, Lin participated in sales and promotion programs for other MLMs. At the other MLMs, unlike at CKB, Lin sold products directly, in addition to developing downlines. Yet, while at CKB, Lin never made a single software sale separate from business packs sold to OMAs. (SEC's 56.1 at ¶¶ 315–16, 321.)

Lin promoted CKB by representing that Prpts had cash value, despite knowing they could not simply be exchanged for cash.[17] He based his presentations to investors on CKB's claims regarding the value, uses, and ever-increasing returns for Prpts. He described Prpts as "passive income," which would increase so long as CKB continued to sell business packs.[18] In his CKB testimonial, he claimed that he had earned over six digits, which included returns on his Prpts. However, Lin knew that Prpts could not be converted to cash. At one point, Lin had attempted to sell his Prpts on the back office exchange, but, like other OMAs, he could not find a buyer. Lin knew that other OMAs had the same experience. (SEC's 56.1 at ¶¶ 324–26.)

Lin also claimed that OMAs could convert their Prpts to stock despite his own difficulty in doing so. He passed along information to potential investors that CKB would have an IPO in July 2014, that CKB would be listed on the Hong Kong stock exchange, and that the IPO would make

---

[17] Lin disputes the SEC's statement that it was his understanding that Prpts were valueless. (Defs.' 56.1 at ¶ 326.) Lin testified that he believed Prpts could be exchanged on the back office exchange in limited quantities (of 200 or 300 Prpts). Thus, Lin was at least aware that Prpts could not simply be exchanged for cash; rather they could only be sold in small batches, assuming the seller could find a buyer, which Lin, and all other OMAs he knew, had been unable to do.

[18] Lin disputes that he told OMAs that the value of Prpts would increase over time, regardless of whether that OMA actively recruited. (Defs.' 56.1 at ¶ 324.) However, his deposition testimony says precisely that:
 Q: But the OMA can refrain from doing anything and the Prpts may still increase in value?
 A: If the company remains to have performant, yes.
(Lin Dep. (Doc. No. 312-1) at 196:21–197:2 at 86–87 (ECF pagination).)

CKB extremely valuable.[19]  In presentations to potential investors, Lin compared CKB's imminent IPO with the successful IPO of another Chinese education company.  However, Lin himself encountered numerous roadblocks to obtaining CKB stock.  Although he first tried to convert his Prpts in 2011, he did not receive a stock certificate until the summer of 2012.  To get it, he had to fly to Hong Kong to visit the CKB office there.  When he arrived, CKB personnel claimed not to have it.  It was only after Lin confronted Leung that she provided him with a signed certificate.  His other attempts, both before and after his attempt in 2011, to convert Prpts to stock failed.  Lin was the only U.S. promoter to receive a stock certificate and was not aware of any other OMAs who received an actual certificate.  (SEC's 56.1 at ¶¶ 327, 329.)

Like other defendants, Lin continued to promote CKB and accept commissions despite accusations and signs that CKB was a fraud.  By October 2012, Lin knew that CKB had been widely accused of being a fraudulent scheme.  Even prior to that, several of Lin's recruits told him that they suspected that CKB was not a legitimate company and, in the fall of 2012, Lin reviewed articles that directly questioned CKB's legitimacy and promotional claims and asserted that CKB was likely a type of money-transfer scheme.  (SEC's 56.1 at ¶¶ 331–32.)

Despite his familiarity with the retail-sale guidelines of other MLMs from his past experiences and his knowledge that CKB did not follow those rules, Lin did nothing to independently evaluate accusations that CKB was a fraud.[20]  Lee never asked Shern or any other

---

[19] Lin "does not admit" that he told OMAs that they could convert their Prpts to stock, that CKB's IPO would occur in July 2014, or that CKB would be as successful as other well-known companies.  (Defs.' 56.1 at ¶ 327.)  However, he testified that he shared materials with OMAs and potential investors, which did make such representations.  Further, Lin testified that he told OMAs and potential OMAs that "we now have points.  And we could use these points to exchange shares.  So in the future we may have the opportunity to become shareholders of the company."  This statement does in fact convey that points could become "shares."

[20] Lin "does not admit" the SEC's statement that he did nothing to evaluate such claims of fraud.  In support, he points to his deposition testimony where the following exchange occurred:

> Q: But when people raised suspicions to you about CKB's business, did you do anything to check on those suspicions?
> A: I didn't, probably because I was either naive or stubborn.  I was firmly believing that the company is having good business.

founder to respond to the fraud accusations. He considered the widespread skepticism about CKB to be irrelevant; he was, as he put it, "stubborn." Similarly, Lin never attempted to verify the statements he continued to make to OMAs and potential investors. He never asked CKB for financial disclosures and he made no effort to verify Shern and other OMAs' statements that CKB would soon go public. (SEC's 56.1 at ¶¶ 334–35.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

---

(Defs.' 56.1 at ¶ 334.) Because Lin fails to raise any dispute and, in fact, confirmed that he did not do anything to investigate, the SEC's statement is adopted.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I.      Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) the Securities Act

The SEC alleges that all defendants violated Section 10(b) of the Exchange Act,[21] Rule 10b-5 promulgated thereunder,[22] and Section 17(a)(1) and (3) of the Securities Act.[23]  The SEC also alleges violations of Section 17(a)(2) of the Securities Act against Shern and the promoters.  These

---

[21] Section 10(b) of the Exchange Act states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

[22] Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[23] Section 17(a) of the Securities Act states:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

sections of the federal securities laws are intended to protect consumers against fraud and misrepresentations in the purchase or sale of securities. To prevail on its claims under Section 10(b) and Rule 10b-5, the SEC must show that each defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp*., 192 F.3d 295, 308 (2d Cir. 1999).[24] "According to the Second Circuit, in the context of violations of Section 10(b) and Rule 10b–5, scienter requires at least willful or reckless disregard for the truth or knowing misconduct." *One or More Unknown Traders*, 2009 WL 3233110, at *4 (internal quotation marks and citations omitted).

For its Section 17(a) claims, the SEC must set forth "[e]ssentially the same elements . . . though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Id.* Additionally, unlike private litigants, "[t]he SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act." *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) (collecting cases).

As set forth below, the undisputed facts show that the SEC is entitled to judgment as a matter of law on its Section 10(b), Rule 10b-5, and Section 17(a) claims.

### a. Material Misrepresentations

As detailed in the facts above, Shern and the promoters each repeatedly made representations to investors that: (1) CKB was a legitimate company, (2) Prpts had cash value, (3)

---

[24] The SEC must also show that defendants engaged in or made use of the instrumentalities of interstate commerce. 17 C.F.R. § 240.10b-5. "[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce.'" *SEC v. Straub*, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) (internal citations omitted); *SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*, No. 08-cv-1402 (KAM), 2009 WL 3233110, at *4 (E.D.N.Y. Oct 2, 2009). The same is true for wire transfers, *One or More Unknown Traders*, 2009 WL 3233110, at *4, interstate travel, *Stampolis v. Provident Auto Leasing Co*., 586 F. Supp. 2d 88, 94–95 (E.D.N.Y. 2008), and email, *SEC v. Shehyn*, No. 2:09-cv-2003 (LAP), 2010 WL 3290977, at *4 (S.D.N.Y. Aug. 9, 2010). It is undisputed that defendants used all of these means to perpetrate this scheme.

OMAs could make active returns by recruiting new investors, (4) OMAs could acquire stock, and

(5) CKB would go public.[25]  These representations were both false and material.

> i.  **Defendants' Representations that CKB was a Legitimate Company were False**

"A pyramid scheme is a mechanism used to transfer funds from one person to another. . . .

A legitimate [MLM] includes a system of distributing products or services in which each participant

earns income from sales of a product to his or her downline *and also* from sales to the public."

*F.T.C. v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 531 (S.D.N.Y. 2000) (emphasis added).

Here, CKB offered no incentive for retail sales.  CKB's Dynamic Rewards Plan awarded

OMAs with commissions solely for recruiting new investors or selling additional business packs to

existing OMAs.  *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 782 (9th Cir. 1996) (finding

proof of a pyramid scheme where "[t]he mere structure of the scheme suggests that Omnitrition's

focus was in promoting *the program* rather than selling *the products*").  Due to this structure,

CKB's actual products largely went unused and unsold.  *See F.T.C. v. Burnlounge, Inc.*, 753 F.3d

878, 888 (9th Cir. 2014) (affirming district court's finding of a pyramid scheme where "rewards . . .

were primarily in return for selling the right to participate in the money-making venture . . . The

merchandise . . . was simply incidental").  Indeed, CKB's proceeds show no revenue attributable to

retail sales of its software.  *See SEC v. Better Life Club of Amer., Inc.*, 995 F. Supp. 167, 172

(D.D.C. 1998), *aff'd* 203 F.3d 54 (D.C. Cir. 1999) (finding that defendant corporation was a

---

[25] Defendants argue they cannot be credited with such statements because their misrepresentations were based on information created and disseminated by CKB.  Even crediting these assertions, defendants are still liable because they controlled their own communications with OMAs and potential investors.  As the Supreme Court has explained:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. . . . One who prepares or publishes a statement on behalf of another is not its maker. . . . This rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit – or blame – for what is ultimately said.

*Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011).

pyramid scheme, in part, because "almost all funds that were coming into [defendant's] accounts were made up of new investments, not of profits from Club activities").

CKB was not a legitimate MLM because it was set up with the "structural certainty of collapse" – its revenue from sale of goods to consumers was insufficient "to cover the production costs or costs of the goods sold, the various marketing expenses, and the promised rewards for recruiting new participants." *Five-Star Auto Club*, 97 F. Supp. 2d at 531. Moreover, not only was CKB structured like a pyramid scheme, but it functioned like one as well. CKB commissions were disproportionately concentrated among a minute percentage of promoters. The top 1% of OMAs earned more than 60% of all commissions. Meanwhile, more than 50% of accounts earned no commissions at all. Accordingly, the Court finds that CKB was not a legitimate company as a matter of law.

### ii.    Defendants' Representations that Prpts had Cash Value were False

Defendants told investors that each business pack contained Prpts worth "$750 dollars" and that they could earn passive returns simply by allowing their Prpts to increase in number and value. These claims were false as a matter of law.

Prpts could not be converted to cash,[26] and their value appears to have been set by CKB – an illegitimate company with no retail sales. Worse, defendants claimed that the value of an OMA's Prpt holdings would rise as CKB grew. Such claims of passive, rapid, and risk-free returns are a common basis for liability in pyramid and Ponzi cases. *See, e.g.*, *SEC v. George*, 426 F.3d 786, 788 (6th Cir. 2005) (upholding summary judgment against defendants, who described an "investment opportunity [that] had all of the hallmarks of a 'free lunch': The investments would be virtually

---

[26] Defendants' arguments – that Prpts had cash value because they could be exchanged in the back office and could be converted to stock of commensurate value – are unavailing as such claims are false. Moreover, even if the back office exchange functioned as claimed by Lee and Lin, Prpts could still not be meaningfully liquidated. At best, OMAs could attempt to liquidate Prpts in the amount of $75 – reflecting the maximum limit of 300 Prpts that could be exchanged and their maximum value set by CKB of 25 cents – and this is only if the seller could find a buyer, which defendants had no success themselves in doing and, at best, knew OMAs would have to "wait in line" to find. This pales in comparison to defendants' representations that investors received $750 in Prpts that would only grow.

risk-free and would generate lucrative returns"); *Better Life Club*, 995 F. Supp. at 176

("[D]efendants continued to recruit and to entice investors with unequivocal, impossible promises

of doubled money in 60 or 90 days.  Defendants never revealed to potential investors that the

Advertising Pool was nothing more than a pyramid scheme; thus, the entire solicitation process was

itself a broad misrepresentation on the grandest scale."); *SEC v. Gagnon*, No. 10-cv-11891 (GCS),

2012 WL 994892, at *10 (E.D. Mich. Mar. 22, 2012) (granting summary judgment for SEC where

defendants claimed "10 to 12.5% on your money per month with No Work and Little to No Risk!");

*SEC v. Art Intellect, Inc.*, No. 2:11-cv-357 (TC), 2013 WL 840048, at *3 (D. Utah, Mar. 6, 2013)

(granting summary judgment for SEC where defendants claimed "a 14% to 26% . . . return, year

after year . . . even if you never lift a finger").

### iii. Defendants' Representations that OMAs Could Make Returns by Recruiting New Investors were False

Defendants told OMAs that they could make active returns by recruiting new members.

While recruitment would produce commissions, in a pyramid scheme "the required number of new

members cannot, in fact, be recruited on a perpetual basis, causing the scheme to collapse of its own

weight . . . ."  *Five-Star Auto Club*, 97 F. Supp. 2d at 531.  "'[T]hose who have the greatest risk of

loss are those who enter the pyramid when the market is closest to saturation . . . . The disclosure

which would be necessary to inform a new investor of his prospects for success or failure would

have to change almost daily . . . .'"  *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1309 (D.C. Cir.

1992) (quoting *Piambino v. Bailey*, 610 F.2d 1306, 1318 n.9 (5th Cir. 1980)).  Because a pyramid

scheme will collapse when it exhausts the pool of new recruits, the vast majority of investors will

not recoup their investment – even if they actively recruit.  Thus, it was false as a matter of law for

defendants to claim that new investors could make active returns.

### iv. Defendants' Representations that OMAs Could Acquire Stock were False

In SEC actions, courts impose liability for false claims that victims can acquire non-existent securities. *See SEC v. Roor*, No. 99-cv-3372 (HB), 2004 WL 1933578, at *5 (S.D.N.Y. Aug. 30, 2004) (granting summary judgment for SEC where defendant promised "phantasmagorical returns on purportedly risk-free investments" that did not, in fact, exist); *SEC v. Gallard*, No. 95-cv-3099 (HB), 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("It is clear by now that the antifraud provisions relied upon by the Commission are applicable even where, as here, the 'security' at issue does not exist."); *see also SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) ("A central purpose of the securities laws is to protect investors and would-be investors in the securities markets against misrepresentations. An elementary form of such misrepresentation is misrepresenting an interest as a security when it is nothing of the kind."); *SEC v. Milan Capital Grp., Inc.*, No. 00-cv-108 (DLC), 2000 WL 1682761, at *2 (S.D.N.Y. Nov. 9, 2000) (granting summary judgment for SEC where defendant "convinced approximately 200 customers to pay almost $9 million for IPO shares . . . [even though defendant] had no access to IPO shares, and never provided any IPO shares to customers").

Here, defendants claimed that OMAs could become CKB shareholders. In many cases, defendants held themselves out to OMAs as shareholders already. As discussed above, defendants were aware that those claims were false. With the exception of Yao Lin, they never acquired stock. OMAs, including defendants, tried to convert their Prpts, but were entirely unsuccessful. As the record shows, CKB had no actual stock to distribute. Accordingly, these claims were false as a matter of law.

### v. Defendants' Representations that CKB Would Go Public were False

Each defendant told victims that their CKB stock would become valuable when CKB achieved its imminent IPO. CKB, however, had not prepared to go public. Defendants' claims had no basis in fact, and no defendant even attempted to verify that their claims that CKB was making

such steps toward an IPO were correct. While certain defendants argue that CKB was taking steps to go public, the record belies such claims. Defendants produced no information regarding the preparation of an IPO, and the back-office data recovered by the SEC contained no communications or records related to CKB's purported IPO.[27] As the SEC points out, CKB would have been precluded from public listing due to its fraudulent business model and lack of corporate structure. However, CKB never planned, initiated, or attempted any such necessary restructuring.[28] Accordingly, these representations were false as a matter of law.

### vi. These Misrepresentations were Material

"Summary judgment on matters of materiality in a securities fraud case is appropriate when the omissions and misrepresentations in question are 'so obviously important to the investor that reasonable minds cannot differ on the question of materiality.'" *Credit Bancorp*, 195 F. Supp. 2d at 492 (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978)); *see also Better Life Club*, 995 F. Supp. at 177 ("The test of materiality is whether a reasonable investor would consider the representations important.").

There can be no doubt that Shern and the promoters' false claims of legitimacy, outsized returns, and pre-IPO stock were material to investors. *See SEC v. Platinum Invest. Corp.*, No. 02-cv-6093 (JSR), 2006 WL 2707319, at *2 (S.D.N.Y. Sept. 20, 2006) (holding that "there can be no question" that claims regarding the timing of an IPO and the likely growth in share price, as well as false claims about the company's business prospects and management, were material as a matter of

---

[27] In opposition to the SEC's motion for an adverse inference on this subject, Shern and Leung confirmed that no such evidence exists. Leung stated that she had turned over all CKB related documents and evidence she had and argued that "just because there are no written records to show there was a plan to go public . . . [didn't] mean that CKB had no plans and had made no preparations to go public." (9/18/15 Leung Letter (Doc. No. 283) at 2.) Similarly, Shern stated, "Yes, there are no documents as all the preparations made were by conduct" and "I did not make any extensive business proposals in writing . . . ." (9/21/15 Shern Letter (Doc. No. 284) at 2; Shern. Aff. (Doc. No. 284-1) at ¶ 7.)

[28] In one communication highlighted by Judge Mann, Shern and Santos discussed an editorial titled "Is CKB186 a Pyramid Scheme?" Shern reassured Santos that he was "busy for two months['] time working with lawyers and accountants to restructure the company." This communication appears to be just another one of Shern's misrepresentations. The record contains no evidence of any such communications with lawyers and accountants. (11/03/15 Report and Recommendation (Doc. No. 295) at 10 n.8.)

law).  Few OMAs ever even used CKB's software.  These misrepresentations were CKB's primary inducements in recruiting new investors, and, as the victims' statements show, they were essential to the decision to invest.  *Five-Star Auto Club*, 97 F. Supp. 2d at 529 ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations."); *Gallard*, 1997 WL 767570, at *3 ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist and that a secondary market did not exist for those securities, and that the money paid for those securities would be misappropriated.").

### b.  Scheme Liability

Rule 10b-5 and Section 17(a) also impose what courts have called "'scheme liability' for those who, with scienter, engage in deceitful conduct."  *SEC v. Jean-Pierre*, No. 12-cv-8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015).  Scheme liability "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); *see also SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014) (explaining that the Second, Eighth, and Ninth Circuits require "deceptive conduct in addition to misrepresentations" that go beyond mere assistance with making the misrepresentation).  Defendants "must have participated in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of creating a false appearance."  *Sullivan*, 68 F. Supp. 3d at 1377 (internal quotation marks and citations omitted).

To prove scheme liability, the SEC must show that defendants: "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter."  *SEC v. McDuffie*, No. 12-cv-02939 (TKK), 2014 WL 4548723, at *10 (D. Colo. Sept. 15, 2014) (citing *SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009)).  "To prove liability under

Securities Act Section 17(a)(3), however, the SEC only has to prove negligence rather than scienter." *Id.* (citing *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012)).

Here, defendants' conduct created a false appearance – namely, that CKB was a legitimate company. As a pyramid scheme, CKB was nothing but a "course of business which operates . . . as a fraud." Shern and each of the promoters thus committed inherently deceptive acts by engaging in what they claimed were the promotional activities of a legitimate MLM – organizing seminars and in-person meetings, providing training and support to downlines, providing access to back office accounts, and portraying CKB's product as useful educational software. *See, e.g.*, *id.* at *10 (granting summary judgment for SEC on scheme liability where deceptive acts included falsely "presenting HMCU to the public as a legitimate credit union"); *SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) (granting summary judgment for SEC where "false promises about expected returns," combined with other conduct intended to further the fraud, "suggest[s] the existence of a wide-sweeping fraudulent investment scheme"). Shern and the promoters also each enrolled victims in the CKB pyramids through the purchase of business packs, *see Sullivan*, 68 F. Supp. 3d at 1378 (finding transactions with investors were "inherently deceptive" because they were not "legitimate" business transactions), and offered victims false assurances about CKB's legitimacy. *See VanCook v. SEC*, 653 F.3d 130, 139 (2d Cir. 2011) (finding scheme liability, in part, for "false assurances").

Shern also launched the scheme, ultimately ran the business, and controlled the manner in which CKB presented itself. Apart from his deceptive promotional acts, his role as scheme architect makes him liable as a matter of law. *See id.* (finding scheme liability where defendant was not "merely associated with the late-trading scheme . . .; he was its architect. . . . [He] was intimately involved with the creation, marketing, and implementation of the system"); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (finding defendant's

"allegedly central role in these schemes, as their chief architect and executor, leaves no doubt as to [his] potential liability" where defendant "masterminded the misleading accounting" and "was intimately involved in all . . . accounting functions").

Finally, Leung administered the commission system, addressed OMA requests and complaints, and facilitated OMAs' investments in CKB. She also controlled the back office system of accounts that operated as a deceit on investors by misstating the value of Prpts and other misrepresentations. *See Sullivan*, 68 F. Supp. 3d at 1378–79 (granting summary judgment against accountant for Ponzi scheme where defendant "solicited further payments from existing note-holders . . . accepted investment deposits in furtherance of the BPF Ponzi scheme . . . [and] generated false reports"). She also signed and provided an illegitimate stock certificate to Yao Lin, which created the false appearance that CKB was a legitimate company that would soon go public.

All of this misleading conduct clearly furthered the scheme by creating the core false appearances at issue here – that CKB was a legitimate company and that OMAs would make, and were making, large returns. Accordingly, defendants are liable for engaging in a fraudulent scheme.

### c. Scienter

"Liability for securities fraud requires proof of scienter, defined 'as a mental state embracing intent to deceive, manipulate, or defraud.'" *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)). "Scienter is established by knowing or reckless conduct, or even in some cases, by willful blindness, i.e., a deliberate refusal to acquire information." *Roor*, 2004 WL 1933578, at *4 (internal quotation marks and citations omitted). "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." *SEC v. Universal Exp., Inc.*,

475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).  For the following reasons, each of the defendants acted with scienter as a matter of law.

### i.    Shern

Shern helped to create CKB and directed its promotional efforts.  Shern himself appears in promotional videos, and other defendants and victims describe him as the source of the key misrepresentations in this case.  More than anyone, he knew those misrepresentations were false.  *See, e.g.*, *Milan Capital Grp.*, 2000 WL 1682761, at *7 (granting summary judgment for SEC where "the SEC has offered ample evidence that Monas was at the center of the fraud"); *Better Life Club*, 995 F. Supp. at 177–78 (granting summary judgment for SEC where defendant "hatched the Advertising Pool scheme, oversaw its marketing, sale, and operation, and managed the finances"); *Art Intellect*, 2013 WL 840048, at *19 (granting summary judgment in Ponzi case against defendants that "were involved in the operations of the business, with significant decision-making power" including being "chiefly responsible for [company's] marketing materials").

Specifically, Shern knew that CKB was not a legitimate company.  Santos presented him with materials that explained the hallmarks of a legitimate MLM.  The criteria therein – for example, sales to retail investors – placed CKB squarely on the wrong side of legitimate.  Shern knew that CKB's products contained numerous defects, were hardly used, and were often a source of dissatisfaction to the few who did use them.  Shern must have known that CKB had no revenue attributable to retail sales and had no plans for an imminent IPO.[29]

In truth, Shern embraced the fact that CKB was a pyramid scheme.  He helped create and distribute a Plan that had no incentives for retail sales.  He made himself a top OMA despite being warned that it would create a conflict of interest.  He explained to other OMAs how to arrange their downlines.  He traveled frequently to the U.S. and other countries, appearing with and otherwise

---

[29] In fact, and as discussed in the previous footnote, Shern represented to Santos that he was in a position to be working with others to restructure CKB to enable the IPO.  Yet he made no such preparations.

33

encouraging promoters. He told audiences that they could earn active returns. He claimed that OMAs could get stock, even though he knew it was illegal for stock to be distributed. In sum, he did everything he could to attract investors, but virtually nothing to sell retail products.

Shern then led a broad and diverse effort to suppress allegations that CKB was a pyramid scheme, including direct written responses to such claims, emails that exhorted OMAs to fight the negative claims about CKB, and the use of technicians to alter search engine results. He took these steps despite knowing that promoters were making false claims and that, by January of 2013, government authorities were investigating CKB.

### ii. Leung

Leung helped found CKB and served as one of WIN168's directors. As CFO, she managed CKB's finances, signed its checks and, with Shern, controlled its accounts. In short, she launched the scheme and then facilitated its operation. She could not have performed those roles had she not been intimately familiar with CKB's Dynamic Rewards Plan, commission structure, and lack of retail sales. *See, e.g.*, *Sullivan*, 68 F. Supp. 3d 1367 (granting summary judgment against accountant who managed accounts on day-to-day basis and was aware of misconduct). Further, Leung knew of the widespread allegations that CKB was a pyramid scheme and she participated in internal conversations with Shern and others regarding how to respond. Despite these allegations, Leung continued to serve as CKB's CFO. She also knew that it was illegal for CKB to issue stock – yet she signed Yao Lin's stock certificate.

### iii. Promoters

The undisputed record shows that the promoters acted with the requisite scienter when promulgating CKB's claims of enormous, risk-free returns and the imminent acquisition of valuable stock. The undisputed record shows that each promoter either knew or recklessly adopted such false statements. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 45 (2d Cir. 1978) ("There

34

is of course no difficulty in finding the required intent to mislead where it appears that the speaker believes his statement to be false.").

Each of the promoters knew that Prpts, in contrast to commissions, could not simply be exchanged for cash. Yet each promoter repeatedly told OMAs and potential investors that they would passively enjoy huge, dollar-denominated returns on their investment, and that each business pack would include "$750" of Prpts. The promoters did not disclose that the purported returns, in the form of worthless Prpts, were an illusion.

The undisputed record also shows that, with the exception of Yao Lin, the promoters never acquired CKB stock. Yet the promoters repeatedly stated in person, in testimonials, at seminars and on the internet that OMAs could convert their Prpts to stock. *See Credit Bancorp*, 195 F. Supp. 2d at 495 ("At the very least, Brandon's actions were reckless as a matter of law when he failed to act after being unable to obtain investors' securities and continued to represent that he had the authority to do so."). Moreover, Guo and Ma both conveyed to OMAs that they actually had stock. They have since admitted that this was not true. *See In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 234 (E.D.N.Y. 2009) ("A defendant who believes his statements to be false acts with requisite scienter."); *see also Constantin*, 939 F. Supp. 2d at 308.

The undisputed record also shows that the promoters were reckless as a matter of law with regard to the fact that CKB was a pyramid scheme. *See Rolf*, 570 F.2d at 45 ("[T]here is general agreement that [scienter] is present when the representation is made without any belief as to its truth, or with reckless disregard whether it be true or false."). By fall 2012, each promoter had been confronted with widespread allegations that CKB was a fraud. Each promoter was also aware of other obvious signs that CKB was a fraud: the claims of rapid, risk-free returns; the lack of an incentive to make retail sales; the inability to convert Prpts to cash on the internal exchange or elsewhere; and the inability to acquire actual stock. Despite these warnings, they failed to

investigate even though each of them was among CKB's very top OMAs. The promoters did

nothing to evaluate CKB's legitimacy besides communicating with Shern. *See Milan Capital Grp.*,

2000 WL 1682761, at *5 ("Where a defendant plays a central role in marketing an investment, his

defense that he was unaware that the investment was a fraud is less credible.").

Courts in this Circuit have broadly condemned the failure of promoters to perform an

adequate investigation in the face of doubtful facts, finding that such a failure amounts to

recklessness as a matter of law. *See Credit Bancorp*, 195 F. Supp. 2d at 495–96 (finding scienter

where defendant "simply accepted Credit Bancorp's excuses without undertaking any independent

investigation whatsoever" and "simply ignored" numerous facts that should have "alerted" him to

irregularities); *Constantin*, 939 F. Supp. 2d at 309 ("To the extent that Solomon did not have direct

knowledge of the falsity . . . we conclude that he acted recklessly in failing to verify the accuracy of

the information."); *Milan Capital Grp.*, 2000 WL 1682761, at *6 (finding that failure to investigate

warning signs "sufficiently indicative of fraud" constituted recklessness); *Universal Express*, 475 F.

Supp. 2d at 427 (finding defendant could not have reasonably believed claims he made where he

"neither possessed nor had sought to obtain any financial information about the entities").

Furthermore, promoter defendants cannot avoid liability by claiming that they relied on the

statements of Shern or other CKB officials. *See Credit Bancorp*, 195 F. Supp. 2d at 495–96; *SEC v.

Milan Grp., Inc.*, 962 F. Supp. 2d 182, 201 (D.D.C. 2013), *aff'd in part, vacated in part, remanded,*

595 F. App'x 2 (D.C. Cir. 2015)[30] ("Ms. Baylor has declared under oath that she relied entirely on

Mr. Pavlico and had no knowledge that Milan and its products were fraudulent . . . . Even crediting

her statements of ignorance, such statements only demonstrate extreme recklessness, not

innocence."); *see also Universal Exp.*, 475 F. Supp. 2d at 427 ("[A]ny *appearance* of substantiation

---

[30] On appeal, the circuit court "affirm[ed] on the fraud counts because we agree with the District Court that no
reasonable juror could find that Baylor did not act with scienter. Indeed, evidence of the requisite recklessness is
overwhelming." *Milan Grp.*, 595 F. App'x at 2.

created by mention of [misleading corporate documents] in the press releases only underscores defendants' wrongdoing, as press releases that purport to be substantiated would seem more likely to mislead the reasonable investor than those that do not. . . . [Defendants'] disregard of such a consequence was not at the least reckless." (internal quotation marks and citation omitted)).

Similar to the present case, in *Gagnon*, defendants promoted a Ponzi scheme by soliciting the purchase of "Mazu Business Packs." Defendant Gagnon repeatedly touted the merits of the investment and vouched for its legitimacy. 2012 WL 994892, at *2. The court awarded the SEC summary judgment because Gagnon:

> Performed no due diligence concerning the profitability of the Legisi program. He did not obtain or review any . . . trading records, bank and brokerage account statements, or e-currency account records at any point prior to, or during, his promotion of Legisi through the Mazu website or Mazu promotional materials. . . . Gagnon admits that he had no knowledge about the finances of the Legisi program. . . . Despite this lack of knowledge, Gagnon wrote of the Legisi program . . . "10 to 12.5% of your money per month with No Work! And Little to No Risk!"

*Id.* at *2. Similar here, even crediting defendant promoters' claims that they relied on the statements of others, they acted recklessly as a matter of law.[31]

## A. Ma's and Lin's Relevant Work History

Two of the promoters possessed specialized experience that further supports a finding that, at a minimum, they recklessly ignored the fact that CKB was a fraud. Ma was a former licensed securities professional. *See, e.g.*, *SEC v. Pittsford Capital Income Partners, LLC*, No. 06-cv-6353 (MAT), 2007 WL 2455124, at *17 (W.D.N.Y. Aug. 23, 2007), *aff'd in part, appeal dismissed in part,* 305 F. App'x 694 (2d Cir. 2008) ("[T]he defendants acted with a high degree of scienter; they

---

[31] Further, by acting as brokers, each of the promoters acquired heightened duties to investigate and disclose. "A broker is under a duty to investigate the truth of his representations to clients, because 'by his position he implicitly represents he has an adequate basis for the opinions he renders.'" *Milan Capital Group*, 2000 WL 1682761, at *5 (quoting *Hanly v. SEC*, 415 F.2d 589, 596 (2d Cir. 1969)). These principles apply even where a defendant, while a broker in practice, is not registered. *SEC v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999). Here, promoters each repeatedly recommended an investment in CKB. However, "in recommending a company's securities to investors, a broker may not rely solely on materials submitted by the company without independent investigation; this duty to investigate is even greater where promotional materials are in some way questionable." *Milan Capital Group*, 2000 WL 1682761, at *5 (internal citations omitted).

were trained securities professionals who repeatedly made materially false and misleading statements and omissions to the investors."); *SEC v. Hasho*, 784 F. Supp. 1059, 1108 (S.D.N.Y. 1992) ("Those who hold themselves out as professionals with specialized knowledge and skill to furnish guidance cannot be heard to claim youth or inexperience when faced with charges of violations of the antifraud provisions of the securities laws.").

While not a formerly licensed securities professional like Ma, Lin had considerable prior experience with MLMs. He knew that legitimate MLM's required promoters to make a high percentage of retail sales. He also understood the distinction between a promoter and a retail customer. Yet, he promoted CKB even though he knew that CKB did not reward OMAs for retail sales and that he himself had not sold software to retail purchasers. At minimum, this supports a finding that he exhibited reckless disregard for the truth.

### d. In Connection with the Purchase or Sale of Securities

Finally, for liability to attach, the SEC must establish that defendants' fraud was in connection with the purchase or sale of securities. "The 'in connection with' factor has been broadly construed. 'Any statement that is reasonably calculated to influence the average investor satisfies the "in connection with" requirement'" of the securities laws. *Credit Bancorp*, 195 F. Supp. 2d at 491–92 (quoting *Hasho*, 784 F. Supp. at 1106) (internal citations omitted). The SEC has met its burden here as the undisputed record shows that defendants' actions and statements were made for the sole purpose of influencing investors to invest in CKB.

The CKB investments here are securities because an investment in a pyramid scheme is itself a security. Under the *Howey* test, "developed by the Supreme Court, a transaction is an 'investment contract' [subject to regulation by the securities laws] if persons invest or loan money to a common enterprise with a promise or expectation of profits to come solely from the efforts of others (generally the promoter or a third party)." *Better Life Club*, 995 F. Supp. at 173 (citing *SEC*

*v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)). Courts have found that pyramid schemes fit this definition. *Int'l Loan Network*, 968 F.2d at 1309; *see also Omnitrition*, 79 F.3d at 784 ("[W]e [previously] declared that investments in a pyramid scheme were 'investment contracts' and thus securities within the meaning of the federal securities laws.").

Here, the *Howey* test is met because new investors purchased business packs to join CKB, a common enterprise,[32] expecting to receive "passive" returns and stock that would appreciate in value as a result of CKB's legitimate corporate efforts. By definition, "passive" means investors sought to profit from others' efforts. *See Int'l Loan Network*, 968 F.2d at 1308 (finding the *Howey* test met where "profits for CFBS investors are expected to accrue, if not solely, at least predominantly from the efforts of others, namely of the downline members"). As such, investment in CKB was an investment contract.

CKB investments were also securities because defendants told investors that by purchasing business packs they could acquire pre-IPO CKB stock.[33] Although "'the fact that instruments bear the label "stock" is not itself sufficient to invoke the coverage of the [securities] Acts,'" the instrument will be considered a security when it possesses "'some of the significant characteristics typically associated with stock.'" *Constantin*, 939 F. Supp. 2d at 304 (quoting *Landreth Timber Co.*

---

[32] CKB was a common enterprise because it had both vertical and horizontal commonality. *See In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("[C]ourts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*."); *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). "Horizontal commonality is characterized as the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits. . . . Strict vertical commonality exists when the fortunes of the investor are tied to the fortunes of the promoter." *In re J.P. Jeanneret Associates*, 769 F. Supp. 2d at 359 (internal quotation marks and citations omitted)); *see also SEC v. Morton*, No. 10-cv-1720 (LAK) (MHD), 2011 WL 1344259, at *15 (S.D.N.Y. Mar. 31, 2011), *report and recommendation adopted,* 2011 WL 11768504 (S.D.N.Y. Nov. 3, 2011) (explaining horizontal and vertical commonality). Because investor money was pooled pending purported cash distributions and a supposed pro rata allocation of stock, and because the purported passive and active returns depended on the efforts of other above and below an OMA in the pyramid, both horizontal and vertical commonality are present here.

[33] Similarly, Prpts themselves may qualify as securities. First, they may qualify as investment contracts. *See SEC v. Rose Fund, LLC*, No. 03-cv-04593 (WHA), 2004 WL 6069175, at *6 (N.D. Cal. Sept. 17, 2004), *aff'd,* 156 F. App'x 3 (9th Cir. 2005) ("[T]he 'participation units' sold by the Rose Fund were investment contracts and thus 'securities' under the Securities Act of 1933 and the Securities Exchange Act of 1934."). Second, they may qualify as convertible instruments, given defendants' representations that Prpts could be converted into stock. *See Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001) ("The fact that the Note's original principal could be converted into AMDL common stock is a strong factor for holding that the Note is a security.").

*v. Landreth*, 471 U.S. 681, 687 (1985)).  Here, defendants repeatedly compared CKB stock to stock in other well-known companies – in other words, stock in its ordinary meaning.  Based on defendants' misrepresentations, OMAs expected to acquire an ownership stake, and the right to enjoy dividends, in a legitimate company that would soon go public.  The fact that the stock was pre-IPO has no bearing on whether it is a security.  *See, e.g.*, *Constantin*, 939 F. Supp. 2d at 304; *SEC v. Shehyn*, No. 04-cv-2003 (LAP), 2010 WL 3290977, at *5 (S.D.N.Y. Aug. 9, 2010) (finding efforts to sell pre-IPO stock in private companies is conduct in connection with the sale of securities).  Nor does it matter for purposes of this analysis that the security did not actually exist. *See Local 8751B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 564 (E.D.N.Y. 1998) ("A fraud in connection with the purchase or sale of a fraudulent security is no less actionable for its fictitious quality.").  For these reasons, defendants' fraud was in connection with the purchase or sale of securities.

## II.      Section 5 of the Securities Act

"Section 5 of the [Securities] Act provides that securities must be registered with the Commission before any person may sell or offer to sell such securities."  *SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  To prove a violation, the SEC must show: "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."[34] *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (internal quotation marks and citation omitted).  Once the SEC establishes a violation, the burden shifts to defendants to show that the securities were exempt from registration.  *Id.*

---

[34] A violation of Section 5 is a strict liability offense.  *SEC v. Stratocomm Corp.*, 2 F. Supp. 3d 240, 263–64 (N.D.N.Y. 2014), *aff'd* 2016 WL 3355378 (2d Cir. June 16, 2016).  Thus, the SEC does not have to show that the defendants violated Section 5 with scienter.  *See, e.g.*, *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997) ("Scienter is not an element of a Section 5 violation."); *accord Kern*, 425 F.3d at 153 (stating scienter was only at issue on remedies for Section 5 violation).

Section 5 can be violated by a direct participants and also by "'[a]n indirect participant, who has not himself passed title to an unregistered security.'" *SEC v. E. Delta Res. Corp.*, No. 10-cv-310 (SJF), 2012 WL 3903478, at *4 (E.D.N.Y. Aug. 31, 2012), *aff'd,* 550 F. App'x 52 (2d Cir. 2014) (quoting *SEC v. Universal Express, Inc*., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)). That indirect participant is liable if, but for their involvement, "the sale transaction would not have taken place – in other words, whether the defendant['s] acts were a substantial factor in the sales transaction." *Id.*; *see also SEC v. Verdiramo*, 890 F. Supp. 2d 257, 271–72 (S.D.N.Y. 2011) (finding that defendant "violated Section 5 because he was a necessary and substantial participant in the unregistered sales" made by others).

Here, defendants did not register the securities described in Section I.d above. Each defendant, with the exception of Leung, offered those securities for sale – securities that could not be obtained on an exchange market and could only be sold by OMAs. The undisputed record shows that Shern and each of the promoters pursued new investors to join CKB as OMAs. In doing so, Shern and the promoters offered prospective investors the opportunity to purchase a $1,380 "business pack." The business pack entitled an OMA to receive Prpts, to purportedly acquire the right to stock, and to invest in what was, in fact, a pyramid scheme. Shern and each of the promoters successfully recruited downlines. To put it simply, defendants offered and sold securities, and therefore violated Section 5.

As for Leung, even if she did not promote CKB, she was a necessary and "substantial factor in the sales transactions." Nearly every CKB financial transaction concerned the sale of business packs – or commissions thereon. As CFO, she thus authorized, directed, and managed the issuance of securities to investors. *See Verdiramo*, 890 F. Supp. 2d at 271 (holding officer liable under Section 5 because he "personally authorized and directed the issuance of the RECOV shares . . . that were later sold in unregistered transactions"); *see also SEC v. Curshen*, 888 F. Supp. 2d 1299, 1308

(S.D. Fla. 2012) (finding liability under Section 5 because defendant opened accounts to facilitate scheme and gave specific buying and selling instructions).  In addition, Leung managed CKB's bank accounts, signed Yao Lin's stock certificate, was featured in CKB promotional literature, and has, in court filings, already admitted that she knew it was unlawful to issue stock, and that she nonetheless did so in violation of Section 5.

As such, each of the defendants violated Section 5 of the Securities Act by offering and selling – or acting as a necessary or substantial participant in the sale of – unregistered securities.

**III.      Shern and the Promoters violated Section 15(a) of the Exchange Act**

"Section 15(a)(1) of the Exchange Act makes it unlawful for a broker 'to make use of . . . interstate commerce to effect any transactions in, or to induce or attempt to induce the purchases or sale of, any security unless such broker is registered [with the SEC].'"  *SEC v. Aronson*, No. 11-cv-7033 (JSR), 2013 WL 4082900, at *7 (S.D.N.Y. Aug. 6, 2013) (quoting 15 U.S.C. § 78o(a)).[35]  The Exchange Act broadly defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(b)(4).

In determining whether an individual is as a broker under Section 15(a), courts consider whether the alleged broker "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors."  *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003).  "Most courts do not require the SEC to establish each of the various cited factors in order to prevail on summary judgment, but rather determine that some combination of factors establishes that the defendant acted as a broker."  *SEC v. Collyard*, 154 F. Supp. 3d 781, 789 (D. Minn. 2015) (collecting cases); *see also George*, 426 F.3d

---

[35] "Scienter is not an element of a Section 15(a) claim." *Aronson*, 2013 WL 4082900, at *7; *see also Stratocomm Corp.*, 2 F. Supp. 3d at 262.

at 797 (rejecting argument that defendant was not a broker because "he was not employed by the issuer of the securities and that, because he ultimately suffered a net loss in the scheme, he did not receive compensation for his work" where defendant "was regularly involved in communications with and recruitment of investors for the purchase of securities"); *SEC v. Hansen*, No. 83-cv-3692 (LPG), 1984 WL 2413, at *11 (S.D.N.Y. Apr. 6, 1984).

These factors overwhelmingly support the conclusion that defendants were brokers as a matter of law. The undisputed record shows that defendants, by the very nature of the CKB Plan, "received commissions as opposed to salary." Defendants each promoted "the merits of the investment," and advised others to invest therein. Defendants were undoubtedly "active rather than passive finder[s] of investors," and urged downlines to find still more investors. Defendants acted as intermediaries between CKB and their downlines, helping to open accounts, accepting investments, and responding to questions and complaints. While the promoters may not have been formal CKB employees, they were clearly its most visible representatives – their testimonials were all visible on the CKB website. *See George*, 426 F.3d at 798 (rejecting argument that defendant "never 'sold securities' because [someone else] controlled the scheme").

In short, defendants devoted themselves to "effecting," and inducing, the purchase of securities. For these reasons, Shern and the promoters violated Section 15 of the Exchange Act by acting as unregistered brokers as a matter of law.

## CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment is granted in its entirety

against defendants Howard Shern, Florence Leung, David Guo, JC Ma, Yao Lin, and Wendy Lee.

The Clerk is requested to email copies of this Memorandum and order to defendants Shern

and Leung at the following addresses:

For defendant Shern:   Hshern@hotmail.com

For defendant Leung:  Florence_Leung@hotmail.com


SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
　　　　September 28, 2016

_____

ROSLYNN R. MAUSKOPF
United States District Judge