# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 1:13-cv-05584-RRM-RLM |
| CKB168 HOLDINGS LTD., et al. | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| ROSANNA LS INC., et al. | ) |
| | ) |
| Relief Defendants. | ) |
| | ) |

## DEFENDANT RAYLA MELCHOR SANTOS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR FINAL JUDGMENT

DICKINSON WRIGHT, PLLC
Jacob S. Frenkel
Attorney for Defendant Rayla Melchor Santos
1825 I Street, NW, Suite 900
Washington, DC 20006
P: 202-466-5953
E: jfrenkel@dickinsonwright.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 3

INTRODUCTION ............................................................................................... 5

ARGUMENT ....................................................................................................... 6

    I.   THE REAL RAYLA SANTOS IS SOMEONE WHOM THE GOVERNMENT
          DOES NOT WANT THE COURT TO KNOW ............................................ 6

    II.  THE CASE LAW PROVIDES A RATIONALE FOR THE COURT
          TO IMPOSE A CIVIL MONETARY PENALTY, WHICH CAN BE
          A DE MINIMIS AMOUNT ........................................................................ 10

    III. THE SEC'S DISGORGEMENT DEMAND REFLECTS A PUNITIVE
          MOTIVATION IN LIGHT OF THE AMOUNT ALREADY ORDERED
          AGAINST AND THE ADDITIONAL AMOUNT THE SEC STILL SEEKS
          TO BE ORDERED AGAINST THE OTHER DEFENDANTS ...................... 13

    IV. RAYLA SANTOS' CIRCUMSTANCES WARRANT THE COURT
          WAIVING ENFORCEMENT OF THE GOVERNMENT'S SOUGHT
          PUNITIVE DISGORGEMENT ORDER, CIVIL PENALTY, AND
          INTEREST ................................................................................................ 16

CONCLUSION .................................................................................................. 19

CERTIFICATE OF SERVICE .......................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Austin v. United States*,
    509 U.S. 602 (1993) ................................................................................. 18

*Balice v. U.S. Dept. of Agriculture*,
    203 F.3d 684 (9th Cir. 2000) ................................................................... 18

*Donovan v. Sovereign Sec., Ltd.*,
    726 F.2d 55 (2d Cir. 1984) ....................................................................... 17

*FTC v. Bronson Partners*,
    654 F.3d 359 (2d Cir.2011) ...................................................................... 13

*Hudson v. United States*,
    522 U.S. 93 (1997) ................................................................................... 18

*Kokesh v. SEC*,
    137 S. Ct. 1635, 198 L. Ed. 2d 86 (2017) ............................................... 19

*Liu v. SEC*,
    140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) ............................................. 14

*SEC v. AMX, Int'l, Inc.*,
    7 F.3d 71 (5th Cir.1993) .......................................................................... 17

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ............................................................... 13, 14

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir.1978) ....................................................................... 13

*SEC v. Cope*,
    No. 14-cv-7575, 2021 WL 653088 (S.D.N.Y. Feb. 19, 2021) ................. 14

*SEC v. Erwin*,
    553 F. Supp. 3d 895 (D. Colo. 2021) ....................................................... 16

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ................................................................... 14

*SEC v. Fischbach Corp.*,
    133 F.3d 170 (2d Cir.1997) ...................................................................... 13

*SEC v. Grossman*,
    1997 WL 231167 (S.D.N.Y. May 6, 1997) .......................................................... 16

*SEC v. Huffman*,
    996 F.2d 800 (5th Cir. 1993) .......................................................................... 17

*SEC v. Inorganic Recycling Corp.*,
99 CIV. 10159 (GEL), 2002 WL 196834 (S.D.N.Y. Aug. 23, 2002) ........................ 9

*SEC v. Razmilovic*,
    738 F.3d 14 (2d Cir. 2013) ............................................................................. 14

*SEC v. Rubin*,
    1993 WL 405428 (S.D.N.Y. Oct. 8, 1993) ................................................. 10, 12

*SEC v. Soroosh*,
    166 F.3d 343, 1998 WL 904696 (9th Cir. Dec. 24, 1998) ................................. 10

*SEC v. Tome*,
    833 F.2d 1086 (2d Cir.1987) ......................................................................... 13

*SEC v. Yun*,
    148 F. Supp. 2d 1287 (M.D. Fla. 2001) ........................................................ 10

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ...................................................................................... 18

*United States v. Muzaffar*,
    714 F. App'x 52 (2d Cir. 2017) ..................................................................... 18

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016) ........................................................................... 19

**Statutes**

15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i) ............................................................ 10

26 U.S.C. § 662l(a)(2) ........................................................................................ 16

## INTRODUCTION

The Securities and Exchange Commission ("SEC") requests that this Court enter final judgment against Rayla Melchor Santos ("Ms. Santos"), and order that Ms. Santos: (1) disgorge $667,231; (2) pay $225,237 in prejudgment interest; and (3) be subject to a one-time tier-three penalty of $160,000. The SEC thus requests that judgment be entered against Ms. Santos in the amount of $1,052,468, even though the SEC appears to acknowledge in its brief that Ms. Santos falls into a category that is markedly different from the other Defendants in this action, as she has "cooperated and shown contrition." (Mot. for Entry of Final J. at 23). This is in stark contrast to the SEC's representation that "[n]o defendant has renounced his, her, or its misconduct" or [a]cknowleged [t]heir [w]rongdoing." (*Id*. at 12). As explained herein, such a substantial monetary judgment against Ms. Santos is patently punitive, and runs afoul of clear directives from this and other courts nationwide.

Ms. Santos is a deeply religious woman whose greatest flaw is her long-standing predisposition to trust blindly in others.   Ms. Santos brings that religiosity to her life-long commitment to bettering the world for women and children, and in particular through education. No better principle reflects who Ms. Santos is than her embrace of Proverbs 22:6, "Start children off on the way they should go, and even when they are old they will not turn from it."  For Ms. Santos, that way for women and children was and always will be education.  Expressed differently, undersigned counsel learned from his father, who was blessed to escape the Holocaust but whose family did not, that "the one thing nobody can take from you is your education."  The spreading of education to the underprivileged of the world was and continues to be Ms. Santos's life mission.  In the ultimate recognition of that dedication, on Saturday, April 4, 2014 at the 9th Annual United Nations Teachers Conference on Human Rights, Ms. Santos

received the prestigious Global Education Motivators (GEM) Award for 2013-2014 for her advocacy on the empowerment of children in schools under the I Am SAM Foundation.  Blinded by this love and dedication, she saw only the good in what she could not recognize was a fraudulent pyramid scheme selling web-based children's educational courses.  Ms. Santos has accepted responsibility for standing by and permitting herself to be led by persons she trusted mistakenly; she now asks this Honorable and wise Court to recognize who Ms. Santos is and enable her to move forward with her life, unburdened by an order of disgorgement and civil monetary penalties that she cannot afford.

Ms. Santos wrought devastation on her own life and reputation as an advocate for children when, in 2011, she became a spokesperson for an educational program that the SEC identified and charged as a fraud, organized, developed, and implemented by others, and five of whom the Department of Justice prosecuted and convicted.  Ms. Santos never before nor after the CKB fraud owned securities, let alone associated with a publicly-traded company as an officer, director, or spokesperson.  And, the facts as known to the SEC – regardless of how aggressively the Agency may seek to demonize her before this Court in its pursuit of disgorgement and civil monetary penalties – reflect that Ms. Santos, at all times, had no securities laws sophistication and worked diligently to promote an educational program in which she sincerely and genuinely believed as beneficial to children.

## **ARGUMENT**

### I.   **THE REAL RAYLA SANTOS IS SOMEONE WHOM THE GOVERNMENT DOES NOT WANT THE COURT TO KNOW.**

Ms. Santos, age 63 and a citizen and resident of the Philippines, has devoted herself to the field of education and improving the lives of women and children, and that includes her affiliation and time with CKB.  From 1973-77, Ms. Santos earned an AB Psychology Degree

from the University of the Philippines.  In 1978, she earned a certification from the St. Nicholas Training Center for the Montessori Method of Education in London.  From 1978-1980, Ms. Santos worked at the Family School of Manhattan in New York as the Pre-School Directress for Lower School and Asian Studies.  Ms. Santos returned to the Philippines in 1980 and worked for the next three years as Headmistress at the Institute for Child Advancement in Magallanes Village, Makati City, Metro Manila, Philippines.  From 1983-1990, Ms. Santos founded and ran a preschool, the Center of Little Learners.  In 1988, Ms. Santos finished her Masters in Educational Administration from the University of the Philippines.  In 1990, Ms. Santos co-authored with her mother the *I Can Read Series, My First Book of "A" Words, A Sound Foundation Approach for Beginning Readers ("E", "I", "O", "U")*, published by Bookmark Publishing.

Subsequently, Ms. Santos developed breast cancer, and serious related health complications left her bed-ridden for a number of years.  She persevered, and, in 1996, established the Stonyhurst School in Batangas City in the province of Batangas, Philippines.  The school started with 32 children and grew to having more than 200 students.  The Stonyhurst School and the academic success Ms. Santos cultivated there were in many ways the fruition of her life's work.

However, while Ms. Santos' professional life flourished, her personal life was in shambles.  After suffering years of physical and emotional abuse from her then husband, Ms. Santos was at a breaking point.  In 2001, after decades of torment, Ms. Santos, along with her two sons and mother, were thankfully courageous enough to leave Ms. Santos' abusive then husband.

But, Ms. Santos and her family fleeing from their abuser, which was done out of sheer desperation to survive, came at a grave cost professionally to Ms. Santos.  Ms. Santos' now ex-husband fully controlled the finances of the Stonyhurst School.  As a result of the family leaving him, he maneuvered for the removal of Ms. Santos' mother as the school's corporate secretary and Ms. Santos as President of the Board.  Moreover, Ms. Santos's ex-husband also controlled with no transparency family finances, to the point of enabling himself to access funds of Ms. Santos' mother also to the detriment of Ms. Santos.  Ms. Santos worked to piece back together her career only to be betrayed again.  In 2006 and 2008, Ms. Santos established the McKinley Hill International School and Leadership Academy for Children in Batangas City and Lipa City, respectively.  Nevertheless, in 2012 after Ms. Santos had grown the schools into successes, her partners ousted her, and Ms. Santos was once again facing professional and financial difficulties.

Against this backdrop, in 2011, Hung Wai ('Howard') Shern ("Shern"), one of CKB's masterminds, whom Ms. Santos knew from her association in 2008 with a multi-level marketing nutritional supplements company, approached Ms. Santos about becoming involved with CKB.  Shern played to Ms. Santos' love of education and children, and her business naiveté.  Ms. Santos genuinely believed in the concept and efficacy of the memory and language program concept that CKB was developing for children in Hong Kong and China.  She believed in CKB so much that she mortgaged her home and used the entire loan proceeds – her own borrowed money – to invest $150,000 into the company.

Ms. Santos is a loving person who embraces everyone and throws her heart and soul into making other people's lives better.  She knows sorrow and pain, especially when her mother, with whom she was very close, died in 2013.  She trusts people, at times too much, and that has hurt her immeasurably.  Ultimately, she made a mistake in judgment in her only foray into public

8

companies and certain co-defendants took advantage of her naïveté.  As she admitted in her December 19, 2014 Admissions contained in Annex A attached to her Consent (Dkt. No. 217-1 at 11, ¶ 46), and to this day, Ms. Santos admits that she was at least reckless in connection with the securities laws issues in the CKB pyramid scheme, particularly as she allowed certain of her co-defendants to use her background and reputation as an accomplished educator and advocate for children (and women) to lend legitimacy to CKB.

Ms. Santos' participation in the CKB conduct calls for proportionality and perspective. The SEC's generalized statement that "no defendant has renounced his, her, or its misconduct … apologized to investors[,] attempted to make them whole … [while mostly stuffing their pleadings] with defiance, finger-pointing and obviously false claims" does not apply to Ms. Santos.  (Mot. for Entry of J. at 12).  In fact, the SEC waits until the very last page of its submission to distinguish Ms. Santos from the other defendants, expressly acknowledging that "she has cooperated and shown contrition." (*Id*. at 23).  Undisputed is defendants Shern and Rui Ling ("Florence") Leung exercised control over CKB's marketing and finances, not Ms. Santos. Five co-defendants have been convicted of criminal conduct – four guilty pleas and one trial – in connection with their activities with CKB; Ms. Santos never was charged criminally.  Ms. Santos accepted responsibility promptly, cooperated fully, and showed contrition, which the Court should acknowledge and reward. *See SEC v. Inorganic Recycling Corp.*, No. 99 CIV. 10159 (GEL), 2002 WL 196834, at *51 (S.D.N.Y. Aug. 23, 2002) ("[The defendant] demonstrated substantial and meaningful contrition by his prompt and significant cooperation in the criminal investigation conducted by the New York County District Attorney's Office.  Such cooperation is important to the investigation, prosecution and punishment of frauds of this kind, and should be rewarded.  Taking this cooperation into account, the Court concludes that the appropriate civil

penalty in [the defendant]'s case is zero."). Ms. Santos' tears during her interview with the SEC were and to this day are tears of pain, remorse, and heartfelt repentance.

## II.     THE CASE LAW PROVIDES A RATIONALE FOR THE COURT TO IMPOSE A CIVIL MONETARY PENALTY, WHICH CAN BE A DE MINIMIS AMOUNT.

Ms. Santos agreed in her Consent Judgment that the Court will impose a civil monetary penalty, the amount of which shall be determined by the Court. (Dkt. No. 252). The Judgment is silent as to parameters for the amount of the civil penalty. The Court is to make such a determination "in light of the facts and circumstances," 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), and may consider a number of factors, including "the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, the deterrent effect given the defendant's financial worth, and other penalties arising from the conduct," *SEC v. Yun*, 148 F. Supp. 2d 1287, 1295 (M.D. Fla. 2001) (citations omitted). Moreover, the Court may consider Ms. Santos' inability to pay now or in the future in determining the amount of civil penalty to impose or whether to waive her civil penalty. *See SEC v. Rubin*, 1993 WL 405428, at \*\*6-7 (S.D.N.Y. Oct. 8, 1993) (court taking into account the ongoing negative effect the permanent injunction will have on defendant's career and defendant's "impecunious ... financial condition" in imposing only a $1,000 penalty); *see also SEC v. Soroosh*, 166 F.3d 343, 1998 WL 904696, at \*2 (9th Cir. Dec. 24, 1998) (imposing a reduced fine because of the defendant's lack of resources); *Yun*, 148 F. Supp. 2d at 1297-98 (taking into account defendant's current dire financial condition in determining the amount of civil penalty to impose).

The facts and circumstances at most support an Order for Ms. Santos to pay only a de minimis amount as a civil penalty, which itself would present a financial strain. As set forth above, Ms. Santos wholeheartedly devoted her life to making other people's lives better and

10

merits this Court's mercy. Additionally, there are significant financial aspects the Court should consider that justify imposing a penalty significantly lower than the SEC's recommended knock-out punch. This case has had a continuing severe negative effect on Ms. Santos' career in education. In fact, Ms. Santos has been unable to obtain gainful employment since the SEC sued her in 2013. (November 4, 2019 Declaration of Rayla Melchor Santos ("Santos Decl.") ¶¶ 1-5 and Exhibits A-C thereto).

The SEC's recommended penalty reflects a First World penalty scale that is detached from the reality of Ms. Santos' Third World situation. Ms. Santos is from the Philippines, where wages are much lower than in the United States, Hong Kong, and other First World countries where the co-defendants reside. Ms. Santos' only employment outside of the Philippines in nearly the last 40 years was her work for CKB. To the extent she has any future job prospects, they almost assuredly will be in the Philippines and at a Philippine pay scale for teachers. The Court at least should calibrate any civil monetary penalty imposed on Ms. Santos to her living and hopefully one day again working in the Philippines.

Next, Ms. Santos has very few assets. She had approximately $6,373.07 and PHP (Philippine Pesos) 3,549,593.67. (Santos Decl. ¶¶ 6-7 and Exhibits D and E thereto). Ms. Santos' total cash assets as described are the equivalent of approximately $75,980.48.[1] But, Ms. Santos is unemployed, and she has been using her dwindling savings as the money on which she survives and lives. (Santos Decl. ¶¶ 1, 6-7). Ms. Santos owned a car, a necessity in Ms. Santos' part of the Philippines where there is no good, safe, or reliable mass transportation system. In 2018, Ms. Santos replaced her more than 10 year old car with her current car, which cost PHP

---

[1] We use the exchange rate of 50.994483 Philippine Pesos to 1 U.S. Dollar as of October 29, 2019, available at https://www.x-rates.com/historical/?from=USD&amount=1&date=2019-10-29.

1,632,000 (approximately $30,720.39).[2]  (Santos Decl. ¶ 8 and Exhibit F thereto).  Ms. Santos

also owns a home, which she bought in October 2004, approximately four years before she met

Shern and more than six years before she ever even heard the letters CKB.  The title to her home

transferred to her officially in February 2011.  (Santos Decl. ¶ 9 and Exhibit G thereto).  The

present adjusted market value of the home and land combined is approximately PHP 4,233,830

(approximately $83,141.42).[3]  (Santos Decl. ¶ 10 and Exhibit H thereto).  The Court should not

include the value of Ms. Santos' home in evaluating Ms. Santos' financial condition for penalty

purposes because Ms. Santos owned the home before any of Ms. Santos' public appearances

promoting the educational program of CKB, for which the SEC seeks to punish and penalize her.

Finally, a civil monetary penalty serves little to no general or specific deterrent effect

given Ms. Santos' challenging financial condition.  Ms. Santos promptly accepted responsibility

for her trusting but naïve decisions that gave rise to her liability, cooperated fully, and has shown

contrition.  In addition, Ms. Santos lives a lifetime devoted to education, has been an upstanding

citizen at all times before CKB and since 2013, and has shown no indicia of recidivism.  She

does not understand securities to participate in securities transactions, and she is the type of

person who would not even look at the business page of a newspaper if she thought doing so

could run afoul of the instant injunction.  Also, as the Court in *Rubin* stated, "[e]ven

considerations of general deterrence do not mandate the maximum penalty in every case.  If they

did, there would be no reason for Congress to have granted courts discretion to impose a lesser

penalty."  *Rubin*, 1993 WL 405428, at *6.  There is a fine line between penalizing someone and

---

[2] We use the exchange rate of 53.124323 Philippine Pesos to 1 U.S. Dollar as of November 9, 2018, available at https://www.x-rates.com/historical/?from=USD&amount=1&date=2018-11-09.

[3] We use the exchange rate of 50.923232 Philippine Pesos to 1 U.S. Dollar as of October 30, 2019, available at https://www.x-rates.com/historical/?from=USD&amount=1&date=2019-10-30.

crippling them.  Ms. Santos has suffered financial and emotional devastation for her actions.  She has been unable to find employment and has dwindling and limited assets.  Anything more than a de minimis civil penalty, if any, would serve little if any general or specific deterrent effect, cripple Ms. Santos financially, and threaten her ability to survive, literally.[4]

Accordingly, Ms. Santos respectfully requests that this Honorable Court exercise its discretion and impose a de minimis civil penalty, if any, on her.

## III.   THE SEC'S DISGORGEMENT DEMAND REFLECTS A PUNITIVE MOTIVATION IN LIGHT OF THE AMOUNT ALREADY ORDERED AGAINST AND THE ADDITIONAL AMOUNT THE SEC STILL SEEKS TO BE ORDERED AGAINST THE OTHER DEFENDANTS.

Ms. Santos' Consent Judgment agrees that the Court will order and determine the amount of disgorgement.  (Dkt. No. 252).  Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct. *See SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997); *see also SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987) ("The paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing."). Disgorgement is an equitable remedy, imposed to "forc[e] a defendant to give up the amount by which he was unjustly enriched." *FTC v. Bronson Partners*, 654 F.3d 359, 372 (2d Cir.2011), quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir.1978). By forcing wrongdoers to give back the fruits of their illegal conduct, disgorgement also "has the effect of deterring subsequent fraud." *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Because disgorgement does not

---

[4] Ms. Santos having engaged Dickinson Wright PLLC should not be misinterpreted or counted against her, because a generous benefactor who appreciates Ms. Santos' goodness and great works felt that qualified counsel would present Ms. Santos to the Court in a pure light, rather than just through the SEC's colored magnifying lens.

serve a punitive function, the disgorgement amount may not exceed the amount obtained through the wrongdoing. *Id*. at 116 n. 25.

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1474 (2d Cir. 1996). While the District Court "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged," *id*. at 1474-1475, the disgorgement award may not "exceed the gains made upon any business or investment," excluding legitimate business expenses. *Liu v. SEC,* 140 S. Ct. 1936, 1948, 207 L. Ed. 2d 401 (2020). Before disgorgement may be imposed, the SEC must first "establish[ ] a reasonable approximation of the profits causally related to the fraud." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013). After the SEC has established such a "reasonable approximation," then "the burden shifts to the defendant to show that his gains were unaffected by his offenses," and a defendant must "clearly ... demonstrate" that the "disgorgement figure was not a reasonable approximation." *Id*. at 31-32.; *see also SEC v. Cope*, No. 14-cv-7575, 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021).

Although the District Court has discretion in determining the amount of disgorgement, disgorgement is an equitable remedy for compensating the victims of securities law violations through divesting a defendant of ill-gotten gains and is not intended to be purely symbolic. As the Supreme Court has made clear in *Liu*, disgorgement is authorized in SEC enforcement actions only to the extent that it "may be appropriate or necessary for the benefit of investors." *Liu*, 140 S. Ct. at 1947.

Here, the Court should reduce the $667,231 in requested disgorgement by at least $549,710.  Ms. Santos admitted that she was at least reckless in the conduct that violated the federal securities laws and recognizes that she must demonstrate that she was enriched unjustly by less than the amount the SEC alleges.  First, as discussed above, Ms. Santos mortgaged her home and invested $150,000 of the untainted funds she borrowed into CKB, which she paid in two $75,000 installments on April 5, 2011 and April 19, 2011, respectively.  (Dkt. No. 425-4 at 1).  CKB later converted Ms. Santos' $150,000 investment to a loan, and CKB paid back Ms. Santos her principal loan amount with interest.  (Dkt. No. 425-5 at 1, 3)  The repayment of $150,000 is merely the return of Ms. Santos' principal, not an ill-gotten profit.  The residual -- $36,597 -- represents interest that CKB paid to Ms. Santos.

Second, Memory Max was one of the life preparatory courses, particularly, a memory enhancement course, comprised of 60 lessons, animated and produced in three languages that CKB was developing for children in Hong Kong and China.  CKB was animating the course in the Philippines.  Because Ms. Santos lived in the Philippines, CKB instructed Ms. Santos to manage and make payments for the development of the course.  As such, Ms. Santos received $399,710 in deposits from CKB, which she used to pay the animators, the Hong Kong-based manager of the project, JJ Kwong, and other related expenses to the development of Memory Max.  (Dkt. 425-5 at 1-4).  The $399,710 was not profit, proceeds, salary, or gain to Ms. Santos.  She did not retain any of the money, she disbursed all of the funds, and the funds in no way inured to her personal benefit.  Ms. Santos merely served as the paying agent for the specific product-related CKB expenses.

The above-mentioned $549,710 was not actual profit or personal gain for Ms. Santos; therefore, the sum does not represent unjust enrichment to her and should not be included in any

15

disgorgement analysis or amount.  Ms. Santos respectfully requests that this Honorable Court subtract $549,710 in calculating the SEC's sought disgorgement amount, and, instead, work only from the sum of $117,521 to consider susceptible to disgorgement. *See SEC v. Erwin*, 553 F. Supp. 3d 895, 906 (D. Colo. 2021) (**"**Mr. Coddington has provided evidence, and the Commission does not dispute, that he made the $120,509.10 in cash withdrawals on his father's behalf and that he transferred the money to his father shortly after withdrawing it. Thus, there is no genuine dispute as to whether Mr. Coddington kept and/or benefitted from the withdrawals. Pursuant to *Liu*, disgorgement of these funds would constitute unauthorized disgorgement beyond Mr. Coddington's net profits from Defendants' wrongdoing.").

Ms. Santos' Consent Judgment accepts that the Court will order prejudgment interest on the amount of Court-ordered disgorgement, and that any prejudgment interest calculation runs from October 9, 2013, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 662l(a)(2).  (Dkt. No. 252).  As discussed above, if the Court follows the Second Circuit case law and works from a conceptual disgorgement sum of at most $117,521, then the prejudgment interest sum should be correspondingly reduced using the same percentage calculation as the one utilized by the SEC.

## IV.   RAYLA SANTOS' CIRCUMSTANCES WARRANT THE COURT WAIVING ENFORCEMENT OF THE GOVERNMENT'S SOUGHT PUNITIVE DISGORGEMENT ORDER, CIVIL PENALTY, AND INTEREST.

In the interest of judicial economy and the parties' time, effort, and costs, Ms. Santos implores the Court to waive enforcement of any Order against Ms. Santos for disgorgement, pre-judgment interest, and a civil monetary penalty.  Ms. Santos' financial hardship does not provide a defense to the SEC's motion for an order of disgorgement, *SEC v. Grossman*, 1997 WL 231167, at *10 (S.D.N.Y. May 6, 1997) ("[T]here is no legal support for [the defendant's]

assertion that his financial hardship precludes the imposition of an order of disgorgement."). However, Ms. Santos' financial inability to pay is a defense to the true practicality of her financial inability to comply with such an order.  *See Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984); *see also SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir.1993) ("financial inability is a defense for failure to comply with a court-ordered disgorgement").  It is Ms. Santos' burden to prove by a mere preponderance of the evidence the extent to which she is financially unable to comply.  *See SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993).

As discussed above, Ms. Santos is unemployed and has been since this case derailed her career and crushed her life in 2013.  If ever someone who deserved the Court's preemptive consideration for sympathy, then she is Ms. Santos.  She has taken responsibility for her actions and cooperated.  She made bad decisions trusting others that have cost her dearly.  And, the reality is that Ms. Santos has dismal job prospects in a Third World country with a pay scale nowhere near American levels and dwindling savings off of which to live for the foreseeable future.  Ms. Santos is unable both to make payments on an order of disgorgement and subsist. To be clear, if Ms. Santos had the financial resources, then she would stroke a check.  That is who she is.  Confronted, however, with the choice between food, electricity, basic needs, and gasoline on one hand and a payment obligation on the other, then Ms. Santos would need to come right back to the Court to seek relief.  Given that the SEC likely would seek to enforce the Court's forthcoming Order, the Court preemptively should waive enforcement of any financial order imposed against Ms. Santos for disgorgement, pre-judgment interest, and a civil monetary penalty.

Not only are the requested amounts of disgorgement, prejudgment interest, and civil penalty inappropriate given Ms. Santos's circumstances, such amounts, if enforced, would

constitute a violation of excessive fines under the Eighth Amendment to the United States Constitution prohibiting the federal government from imposing unduly harsh penalties. The Eighth Amendment also protects against excessive civil fines, as noted in *Hudson v. United States*, 522 U.S. 93 (1997). In addition to monetary payments, the excessive fines clause applies to forfeitures of property, as held in *Austin v. United States*, 509 U.S. 602 (1993). The U.S. Supreme Court declared a fine as excessive in violation of the Eighth Amendment in *United States v. Bajakajian*, 524 U.S. 321 (1998). In *Bajakajian*, the court determined the fine was unconstitutional, reasoning that the forfeiture was grossly disproportionate to the crime.

To determine whether the fine is unconstitutionally excessive, the Court must assess it using the four Bajakajian factors: (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct. Although *Bajakajian* was decided against the backdrop of a criminal forfeiture statute, these factors apply equally, albeit modified slightly, for fines assessed in the civil context. *See Balice v. U.S. Dept. of Agriculture*, 203 F.3d 684, 698-99 (9th Cir. 2000) (applying *Bajakajian* factors to civil fines levied under the Agricultural Marketing Agreement Act).

Here, as explained thoroughly, *supra*, the requested disgorgement, prejudgment interest, and civil penalty are not consistent with Ms. Santos's unlawful conduct and limited involvement in the unlawful conduct of others. And, with Ms. Santos's livelihood at stake, the constitutional prohibition against excessive fines and penalties is on full display. The SEC's requests as applicable to Ms. Santos should be denied. *See United States v. Muzaffar*, 714 F. App'x 52, 58 (2d Cir. 2017) ("This Court recently held that, in addition to the four *Bajakajian* factors above,

courts may consider whether forfeiture 'would deprive an offender of his livelihood.'" (quoting *United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016)).

<u>**CONCLUSION**</u>

The SEC's drive to extract disgorgement and a civil monetary penalty from Ms. Santos, neither of which she can afford, and which would be nominal if not inconsequential measured against the fact that the SEC already has obtained disgorgement orders in the amount of $7,364,420.25 and still seeks $144,405,001 in disgorgement and penalties from the other defendants, highlights that the SEC is indifferent to Ms. Santos' financial hardship and only seeks to punish her.  It rings of the Supreme Court's conclusion in *Kokesh v. SEC*, 137 S. Ct. 1635, 1644, 198 L. Ed. 2d 86 (2017) as to the SEC's improper use of SEC disgorgement actions as "bear[ing] all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate."  *Id*. at 1644.  Here, where Ms. Santos not only lacks the financial wherewithal to "compensate" but the SEC essentially seeks also to render Ms. Santos destitute in the Philippines is punitive in all respects.

In reading the SEC's demand for disgorgement and civil penalties against Ms. Santos, one only can think of the compelling applicability of the famous lyrics from the Wizard of Oz, as sung by the "Tin Man":

> When a man's an empty kettle he should be on his mettle,
> And yet I'm torn apart.
> Just because I'm presumin' that I could be kind-a-human,
> If I only had a heart
> I'd be tender – I'd be gentle and awful sentimental
> Regarding love and art.
> I'd be friends with the sparrows ... and the boys who shoots the arrows
> If I only had a heart.

Ms. Santos is all heart -- gentle, sentimental, friends with the Creator's creatures and certainly "the boys [and girls] who shoots (sic) the arrows."  She opened her heart to the wrong people,

and she already has paid a steep price, including a seriously and grievously wounded heart. The facts as related to Ms. Santos are extremely unusual; for that reason, Ms. Santos, through counsel, asks this Court to impose the unusual but warranted disposition of waiving any disgorgement amount, civil monetary penalty, and attendant interest.

Respectfully submitted,

 /s/ Jacob S. Frenkel
Jacob S. Frenkel
Dickinson Wright, PLLC
1825 I Street, NW, Suite 900
Washington, DC 20006
P: 202-466-5953
E: jfrenkel@dickinsonwright.com

Attorney for Defendant Rayla Melchor Santos

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that on May 20, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court and served on the parties or parties' counsel by ECF in accordance with the Federal Rules of Civil Procedure, and pursuant to email for pro se defendants Howard Shern and Florence Leung and the entities they controlled.  In addition, I have sent via United States Mail postage prepaid, a true and correct copy of the foregoing to pro se defendant Joan Congyi Ma.

Respectfully submitted,

 /s/ Jacob S. Frenkel
Jacob S. Frenkel
Dickinson Wright, PLLC
1825 I Street, NW, Suite 900
Washington, DC 20006
P: 202-466-5953
E: jfrenkel@dickinsonwright.com

Attorney for Defendant Rayla Melchor Santos